588 So.2d 814 (1991)
In the Matter of the ENLARGEMENT OF the CORPORATE LIMITS OF the CITY OF HATTIESBURG, Mississippi.
OAK GROVE CONCERNED CITIZENS, INC. and Shadow Wood/Richburg Concerned Citizens, etc.
v.
CITY OF HATTIESBURG, Mississippi, etc. and
CITY OF HATTIESBURG, Mississippi
v.
OAK GROVE CONCERNED CITIZENS, INC. and Lamar County Board of Supervisors.
No. 89-CA-0135.
Supreme Court of Mississippi.
May 29, 1991.
Rehearing Denied December 4, 1991.
*816 Wallace R. Gunn, Hattiesburg, for Oak Grove.
Paul Richard Lambert, Hattiesburg, C.R. Montgomery, Jerry R. Wallace, Montgomery Smith-Vaniz & McGraw, Canton, for Hattiesburg.
Frank D. Montague, Jr., Montague Pittman & Schwartz, Hattiesburg, for Hood, et al.
John W. Lee, Jr., Hattiesburg, for Mason, et al.
Kent F. Hudson, Purvis, Kathy D. Sones, Columbia, for Lamar County Bd. of Sup'rs.
Jerry L. Mills, Pyle, Dreher, Mills & Woods, Jackson, G. Kenner Ellis, Jr., Greenville, for amicus curiae.
En Banc.
HAWKINS, Presiding Justice, for the court:
This case is before us on two separate appeals from the decree of the Forrest County Chancery Court denying in part and affirming in part an ordinance of the City of Hattiesburg seeking to extend and enlarge its municipal corporate limits. The City appeals the chancellor's decision to deny the city's annexation of certain Lamar County lands. The Oak Grove Concerned Citizens Association and the Shadow Wood/Richburg Concerned Citizens Association appeal the chancellor's decision to allow the annexation of certain Lamar County lands. We affirm.

FACTS
On April 28, 1987, the city of Hattiesburg adopted Ordinance No. 2261, a proposal to enlarge the corporate boundaries of Hattiesburg from approximately 23 square miles to approximately 112 square miles by annexing approximately 86 square miles of territory in Forrest and Lamar Counties. That same day Hattiesburg filed petitions for confirmation of the annexation ordinance in the chancery courts of Forrest and Lamar Counties. The courts consolidated these petitions shortly thereafter and set the petition for a hearing in the Forrest County Chancery Court.
The area Hattiesburg sought to annex included about 63 or so square miles to the north, south and west of the city in Forrest County and about 23 square miles to the west of the city in Lamar County. The proposed annexation area included the Rawls Spring Community and the Glendale/Eatonville Community in northern Forrest County; the Forrest County Country Club area in northwestern Forrest County; the Bonhommie Community, Irene Chapel/Palmers Crossing Community and Dixie Community in southern Forrest County; and the Oak Grove Community in Lamar County.
Many Forrest and Lamar County residents filed objections. Among these objectors were the Forrest County Board of Education, the Board of Trustees of the Forrest County Agricultural High School, the Dixie Against Annexation Committee, the Dixie Community Utility Association, the Lamar County Board of Supervisors, the Lamar County School District, the Oak Grove Concerned Citizens Association, and other individual residents of both counties.
On August 14, 1987, Hattiesburg and a group of Forrest County objectors filed a joint motion for partial summary judgment, asking the court to delete the Dixie Community, the Rawls Spring Community, and the Glendale/Eatonville Community from the proposed annexation area. On November 5, the chancellor granted partial summary judgment and thereby allowed the city to delete approximately 28 square miles of territory in Forrest County from the proposed annexation. (See Appendix A.)
*817 On June 6, 1988, the chancellor began a full hearing to determine the reasonableness of the city's proposed annexation of approximately 22 square miles in Forrest County and approximately 23 square miles in Lamar County. The only objectors at the trial were the Oak Grove Concerned Citizens Association [hereinafter Oak Grove] and the Lamar County Board of Supervisors. The trial lasted five days. Twenty-four witnesses testified. Counsel at this time also signed an order which allowed the chancellor to travel throughout Hattiesburg and the proposed annexation area to examine the areas.
On September 26, 1988, the chancellor filed a memorandum opinion in which he approved the annexation of approximately 22 square miles in Forrest County and denied the city's request for approximately 23 square miles in Lamar County. The chancellor found that Hattiesburg failed to prove the reasonableness of its proposed annexation of the Lamar County area and that his confirmation of the annexation of the 22 square miles in Forrest County afforded the city "ample area to meet its foreseeable needs for growth."
This memorandum opinion was not, however, a final judgment. In an October 6 addendum to his opinion, the chancellor delayed final judgment to give all parties to the proceeding time to file any post-trial motions they desired without being prejudiced by Rule 59.
After the memorandum opinion, many individuals filed motions for reconsideration.
On October 6, 1988, James Richard West; Warren A. Hood, Jr.; R.L. Kemp, Jr.; Kemp Company, Inc.; and Smith Petroleum, Inc. (hereinafter the "Hood Parties"), filed a motion for reconsideration, asking the court to reconsider and approve the annexation of their Lamar County commercial property that was adjacent to the city's western boundary.
On October 6, Wesley Health System, Inc.; Toxey M. Morris, M.D., P.A.; Nathan P. Shappley, M.D., P.A.; Pearl River Valley Electric Power Association; and Ear, Nose & Throat and Facial Plastic Surgery, P.A. (hereinafter the "Wesley Health Parties"), also filed a motion for reconsideration, asking the court approve the annexation of their Lamar County property adjacent to the city's western boundary.
On October 21, Bennett V. York, Mrs. O.E. Hart, Individually and as administratrix of the estate of O.E. Hart, Jr.; R.L. Kemp, Jr.; Jerry L. Kemp; and Trustmark National Bank as Trustee under and of the R.L. Kemp Individual Retirement Account (hereinafter the "York Parties") filed a motion for reconsideration, asking the court to include approximately 183 acres of Lamar County land adjacent to the city's western boundary in the city's annexation, asserting that the property was the future site of a new regional mall.
On October 21, several other parties also filed motions for reconsideration, asking the chancellor to include their Lamar County lands in the annexation. Parties filing motions on October 21 included Tony Lee Mason and wife, Elvira Rios Mason; Claud C. Stephens and wife, Sharon D. Stephens and Sudie M. Albright; Frank M. Anderson and wife, Dolores Anderson and Jewel Moody; Myrtle S. Aultman; David M. Cox, Inc.; John L. Anderson and wife, Louise Patterson Anderson; and Gaston Smith. These parties (hereinafter the "Interstate 59 Parties") all owned property in Section 24 or Section 25 in Lamar County east of Interstate 59, which runs north and south through part of the existing limits of Hattiesburg.
Several groups of Forrest County residents also filed motions for reconsideration, asking the court to exclude certain Forrest County land that it had previously approved for annexation into the city; however, there is no issue on appeal as to these motions.
Hattiesburg joined in all the motions for reconsideration involving lands in Lamar County. Oak Grove and the Lamar County Board of Supervisors filed motions to strike all the motions for reconsideration, asserting that none of the movants were parties to the cause or proper intervenors; therefore they had no standing to ask for reconsideration.
*818 On December 2, the court filed an order declaring that all motions and responses filed since September 26 through November 22 were to be considered as though they were post-judgment motions and responses.
On January 23, 1989, the chancellor in another opinion reconfirmed the annexation of approximately 22 square miles of territory in Forrest County and also approved the annexation of certain Lamar County lands. (See Appendix A) The chancellor noted a mistake he had made in drafting his earlier opinion. He stated that he intended to confirm the annexation of that portion of Lamar County in Section 25, Township 4 North, Range 14 West lying east of Interstate Highway 59, adjacent to the previously approved Forrest County annexation area and widely known as the Shadow Wood/Richburg area. (See Appendix A)
The court also approved the annexation of the lands of movants: the Wesley Health Parties (54 acres); the Hood Parties (31 acres); the York Parties (183 acres). The chancellor also amended his earlier opinion to include the lands of Immanuel Baptist Church, the land of the Lamar County Northeast Volunteer Fire Department, and all the highways, roads and public ways embraced within the block of territory comprised of the named tracts or parcels of land. The court reasoned as follows:
The location and topography as well as the existing development and uses of this area, lead to the inescapable conclusion that the future of the area is only commercial. Commercial development of the area will in no wise impact adversely upon the existing residential areas of the Oak Grove community nor upon the residents thereof. In particular, the medical community that already exists adjacent thereto, coupled with the obvious continued expansion of medical facilities and services connected with those already there, can only result in substantial beneficial impact upon quite large portion of Lamar County, even possibly extending over into nearby areas of other adjoining counties.
(See Appendix A)
On February 3, 1989, the Court ultimately entered final judgment in the annexation case. Oak Grove, the Shadow Wood/Richburg Concerned Citizens Association [hereinafter Shadow Wood], and Hattiesburg subsequently filed notices of appeal.
On February 21, this Court entered an order on the joint motion of the parties for the partial dismissal of Oak Grove's appeal of the chancellor's decision to include the land of the Wesley Health Parties, the land of the York Parties, and the land belonging to Smith Petroleum, Inc., and approved the immediate annexation of the Wesley Health Parties, the York Parties, and the Smith Petroleum lands.

I. HATTIESBURG'S APPEAL

A. REASONABLENESS OF THE ANNEXATION
Hattiesburg appeals as manifestly wrong the chancellor's decision to deny the annexation of approximately 23 square miles of territory in Lamar County. This area largely consists of farmland and the residential area known as the Oak Grove Community. In 1987 the area had a population of approximately 6,315.
This Court has set forth a list of factors or so called indicia of reasonableness to guide the chancellor in his determination of the reasonableness of a city's annexation request. The Court first enumerated these factors in Dodd v. City of Jackson, 238 Miss. 372, 396-97, 118 So.2d 319, 330 (1960), and in later decisions has expanded the list.
When the court heard Hattiesburg's annexation request, the factors to be considered by the chancellor in annexation proceedings included: (1) the city's need for expansion; (2) whether the areas the city sought for annexation were reasonably within the city's path of growth; (3) the potential health hazards from sewage and waste disposal in the proposed annexation areas; (4) the city's financial ability to make improvements to the proposed annexation *819 areas and furnish municipal services; (5) the need for zoning and overall planning in the area; (6) the need for municipal services in the proposed annexation area; (7) the existence of natural barriers between the city and the proposed annexation area; (8) the past performance and the time element involved in the city's provision of services to its present residents; and (9) the interest of and consequences to the landowners in the proposed annexation area. Dodd, 238 Miss. 372, 118 So.2d 319 (1960); Extension of Boundaries of Horn Lake v. Renfro, 365 So.2d 623 (Miss. 1978); Extension of Boundaries of City of Ridgeland, 388 So.2d 152 (Miss. 1980); and Western Line Consolidated School District v. City of Greenville, 465 So.2d 1057 (Miss. 1985).[1]
These factors, however, are only indicia of reasonableness, not separate and distinct tests in and of themselves. Bassett v. Town of Taylorsville, 542 So.2d 918, 921 (Miss. 1989). The chancellor must consider all of these factors and determine whether under the totality of the circumstances the annexation is reasonable. Id. at 921-22; In the Matter of the Extension of the Boundaries of the City of Vicksburg, 560 So.2d 713, 716 (Miss. 1990); In re Enlargement of Corporate Boundaries of the City of Booneville v. City of Booneville, 551 So.2d 890, 892 (Miss. 1989); In the Matter of the Extension of the Boundaries of the City of Jackson, 551 So.2d 861, 864 (Miss. 1989). This Court's standard of review is very limited. The Court can only reverse the Chancery Court's findings as to the reasonableness of an annexation if the chancellor's decision is manifestly wrong and is not supported by substantial and credible evidence. As restated in Extension of the Boundaries of City of Vicksburg, 560 So.2d 713, 716 (Miss. 1990):
[I]f there is credible, albeit conflicting evidence, this Court will defer to the Chancery Court's findings. Bassett, 542 So.2d at 921, citing McElhaney [v. City of Horn Lake], 501 So.2d [401] at 403; [Miss. 1987] [Extension of Boundaries of] Moss Point [v. Sherman], 492 So.2d [289] at 290; [(Miss. 1986)] Liddell v. Jones, 482 So.2d 1131 (Miss. 1986); Hans v. Hans, 482 So.2d 1117 (Miss. 1986). In the context of conflicting credible evidence, this Court will not disturb a lower court ruling unless it can be said that from all the evidence such findings are manifestly wrong. Bassett, 542 So.2d at 921, citing McElhaney, 501 So.2d at 403; Extension of Boundaries of City of Biloxi v. City of Biloxi, 361 So.2d 1372, 1376 (Miss. 1978); City of Picayune v. Quick, 238 Miss. 429, 117 So.2d 718 (1960).
See also In re Enlargement of the Boundaries of Yazoo City v. City of Yazoo City, 452 So.2d 837 (Miss. 1984); In the Matter of the Extension of the Boundaries of the City of Clinton v. City of Clinton, 450 So.2d 85 (Miss. 1984); Curet v. City of Long Beach, 399 So.2d 1351 (Miss. 1981).
An examination of the record reveals that Chancellor Dale was within his discretion in confirming only part of the annexation proposed by Hattiesburg. His decision to allow the annexation of some Lamar County land, but to deny annexation of other Lamar County land was neither manifestly wrong nor unsupported by substantial, credible evidence.

1. THE CITY'S NEED FOR EXPANSION
The chancellor concluded that the 22 square miles of territory in Forrest County that he allowed the city to annex would provide the city ample area to meet its needs for growth for many years to come.
*820 Hattiesburg insists that the chancellor made a mistake and that the city, in addition to the 22 square miles in Forrest County, also needs approximately 23 square miles in Lamar County in order to meet its needs for growth. Corrine Fox, a city planner with Continental Consultants, Inc., of Jackson, testified that only 2.47% of the territory within Hattiesburg is vacant and without constraints to development. Land with constraints to development includes land within the 100 year flood plain, land with a slope in excess of 10%, or land with serious soil limitations. Fox testified that if Hattiesburg were not allowed to annex more developable land that the city would run out of land in three to four years and commercial developers would go outside the city to find more attractive land. Fox indicated that already the area outside the city, referring to Lamar county, was growing at a faster rate than Hattiesburg.
Joseph Lusteck, president of Lusteck and Associates of Jackson, a real estate planning and consulting firm, also testified concerning Hattiesburg's population growth and trends. Lusteck estimated that as of May, 1988, Hattiesburg had a population of 44,757. He arrived at this figure through the use of a housing count method which required a determination of the number of residential units in the city, the number of houses occupied, and the number of persons per occupied unit. Lusteck further testified that Hattiesburg was experiencing growth and that the city's population would be 46,700 by 1993 and 49,000 by the year 2000. Lusteck's population estimate was considerably higher that the U.S. Department of Commerce's estimate of 40,740. On cross, Lusteck admitted that his original research revealed that the city had a much lower population and, in fact, had experienced a decrease in population for the period of 1980 through 1986.
Oak Grove and the Lamar County Board of Supervisors asserted that Hattiesburg was not experiencing growth and that the city had no need for expansion. Vernon Kelley, a certified planner and executive director of Three Rivers Planning Development District testified that Lusteck's population estimates and projections were grossly exaggerated, that between 1960 and 1987 that the city had experienced no real growth. Most of Hattiesburg's population growth, Kelly testified, was annexed growth, not real population growth. Kelly's chart shows:

 POPULATION TRENDS
 CITY OF HATTIESBURG
 1960-1987
 Total Change
 Additions Persons In
Total No. of Over Deaths Added By Pop. Real
Population Persons By Live Births Births & By Growth
 Annexed Over Deaths Annex. Census Rate
----------------------------------------------------------------------------
1960 34,989 1,276 4,330 5,606 3,288 -2,318
To
1970 38,277 -0- 1,588 1,588 2,552 +964
To
1980 40,829 683 1,614 2,297 -89 -2,386
To
1987
Total 40,740 1,959 7,532 9,491 5,751 (-3,740)
Sources: Miss. R & D. Center Ms. Bus. Vol. 47 No. 2 U.S. Census Block Data
 Miss. State Board of Health, Births & Deaths, Hattiesburg Residents
 1960-1986

*821 Kelly added that the city's density trends likewise indicated that Hattiesburg was not experiencing real population growth; that in 1980 the city had a density of 3.27 persons per acre whereas, in 1987, the city only had a density of 2.88 persons per acre. Kelley stated decreasing density trends mean that a city is not growing and a density factor of 2.88 was relatively low in comparison to other Mississippi cities of comparable size.
Further, Kelley criticized the methodology used by Continental Consultants and Lusteck in arriving at the conclusion that only 2.47% of the land within the city of Hattiesburg was without constraints to development. Kelley stated that these constraints were unrealistic, pointing out that much of the land already developed in the city has such physical constraints and approximately 50% of the land in the city now had soil constraints. Yet, the city had built on this land. Kelly pointed out that if one developed only land that had less than a 10% slope, there would be no homes in North Mississippi.
George Stepko, the planner for the Tatum Development Corporation and a past Director of City Planning for Hattiesburg, testified for Lamar County as to Hattiesburg's need to expand into Forrest County rather than Lamar County. The Tatum Development is an area in Forrest County that is south of the Hattiesburg city boundaries and south of Highway 49 and Highway 11. The area encompasses 4,400 acres or almost seven square miles of land. All of this area is either already in the city or included in the proposed annexation area. Stepko testified of the developers plan to develop a planned community on the property. The community, Stepko said, would include single-family housing, multi-family housing, commercial establishments, medical facilities, golf courses, office buildings, and light industrial facilities. Stepko anticipated that this area would be a high growth area in the future because it was connected to Highways 49 and 11 and was near the industrial park and Camp Shelby.
The chancellor's opinion as to the city's need for expansion is supported by substantial and credible evidence. Hattiesburg's population growth in the past has not been explosive. Density trends and population charts demonstrate Hattiesburg's lack of growth. The 1990 census also indicates that Hattiesburg's growth has been meager. Hattiesburg's 1990 census revealed that the city had a population of 41,882. In 1980 Hattiesburg's population was 40,963. Thus, in the past ten years Hattiesburg's population increased by 1,053. When viewing this increase, one must take into account Hattiesburg's earlier annexation in the 1980's which brought approximately 680 people into the city and Hattiesburg's 1989 annexation which brought approximately 4,800 people into the city. The added 22 square miles in Forrest County together with the area in Lamar County along Highway 98 and east of Interstate 59 should provide the city with enough land for expansion. See City of Greenville v. Farmers Inc., 513 So.2d 932, 934-35 (Miss. 1987).

2. WHETHER THE PROPOSED ANNEXATION AREA IS REASONABLY WITHIN PATH OF GROWTH OF THE CITY
With regard to the path of growth, the chancellor stated that the city's path of growth seemed to be to the south into the previously undeveloped Forrest County land lying adjacent to the city. He indicated that the Forrest County area was readily accessible by Highways 49 and 11 and Interstate 59, whereas the proposed annexation area in Lamar County had limited accessibility. The chancellor also found that the Lamar County area adjacent to the city's western boundary may have been a path of growth at one time but now it was not because the area was now highly developed with numerous subdivisions and some commercial development.
Hattiesburg asserts that the area it seeks to annex in Lamar County is in the path of growth of the city. Experts for the city testified that the historical and potential path of growth for Hattiesburg is to the north, south, and west. Future expansion *822 to the east is constrained by the municipal boundary of Petal. Continental Consultants stated that some of the most spectacular growth had occurred to the west, north, and south of Highway 98 in such areas as Lamar Park, Westover West, and West Lake Manor. In a reference to the Tatum Development, Continental also stated that development was also occurring to the south of the city and that such development may increase rapidly.
Witnesses for Oak Grove and the Lamar County Board of Supervisors countered that the Lamar County area was no longer reasonably within Hattiesburg's path of growth. Vernon Kelley testified that the area of Lamar County immediately adjacent to the western boundary may have been reasonably within Hattiesburg's path of growth at one time, but not anymore. Testimony indicated that the area west of the city in Lamar County began developing in the 1960's and since then has experienced substantial growth. Kelly testified, however, that Lamar County was not experiencing much growth at present. Growth, emphasized Kelley, follows the major transportation corridors. Kelley stated that growth in the Lamar County area west of the city along Highway 98 had come to a halt because the three accesses to the area, Highway 98, Richburg Road, and Fourth Street, had become very congested. The area just south of the city in Forrest County, Kelly concluded, was ripe for development because of the new thoroughfare just built which ties Richburg Road into Highways 11 and 49.
The area in Lamar County that Hattiesburg seeks to annex is in the path of growth of the city. Yet, as the chancellor recognized, a city technically can grow in any direction as long as there are no formidable barriers in the way such as the boundary of another city. The chancellor, in considering whether or not the Lamar County area was reasonably in the city's path of growth, however, looked at all possible directions in which the city could grow and tried to determine which area would experience growth. The court decided that the area near the southern boundary of the city in Forrest County would be a reasonable path of growth for the city. The testimony about the Tatum Development to the south of the city and the testimony about the limited accessibility of the Lamar County area support the chancellor's decision. This Court cannot say that the chancellor's decision concerning the city's path of growth was manifestly in error. Bassett, 542 So.2d at 921, citing McElhaney, 501 So.2d at 403; Extension of Boundaries of City of Biloxi, 361 So.2d at 1376.

3. THE EXISTENCE OF POTENTIAL HEALTH HAZARDS IN THE PROPOSED ANNEXATION AREA
The chancellor, while stating that most of the inhabitants of the Lamar County territory sought to be annexed were served with utilities by private and/or community systems, found that there was nothing in the record which remotely approached convincing proof of any health hazards to the inhabitants of the area.
Hattiesburg presented some evidence of potential health hazards in the area to be annexed, but the evidence was not very specific or overwhelming. Bryan Baker, president of Continental Consultants, testified that he observed a number of ditches and lagoons in the annexation area that did not turn out their effluent. Baker indicated that he had a professional environmental agency do fecal coliform counts in about eight areas in the Lamar and Forrest County proposed annexation areas. He said that only one of the areas had a coliform count that was above the level which is considered safe. The area which contained high concentrations of fecal coliform was a large lake in Forrest County north of the Forrest County line and just west of the Hattiesburg Country Club in the southwest quarter of Section 35. The coliform count in the lake was 2,100, just 100 colonies above the acceptable level of 2,000. Baker also testified that he observed two overflowing dumpsters near a lagoon in Lamar County south of Highway 59 in a mobile home park. Finally, Baker testified that a considerable amount of the soil in the Forrest and Lamar County area was *823 highly expansive, did not percolate very well, and was not suitable for septic tanks.
Oak Grove and Lamar County presented evidence showing that there were no potential health hazards in the Lamar County proposed annexation area and if there were, they were of the type commonly found in any area where people lived. The objectors stressed that the high concentration of fecal coliform was found in Forrest County, not Lamar County. Charles Henderson, the sanitarian for Forrest and Lamar County, testified that from an environmental health perspective he knew of no potential health hazards in the Lamar County area. He stated that while some of the soil in the southern and northern part of the Forrest County area within the proposed annexation posed some serious problems for the use of septic tanks, the soil within the proposed annexation area in Lamar County was sufficient to percolate for septic tanks. Henderson stated that he was not aware of any serious sewer problems with individual systems in the Lamar County area.
Again, the chancellor's opinion is supported by substantial and credible evidence, so we must affirm his findings. Extension of Boundaries of Vicksburg, 560 So.2d at 761. Hattiesburg failed to present any convincing evidence of potential health hazards in the area.

4. THE CITY'S FINANCIAL ABILITY TO MAKE IMPROVEMENTS TO PROPOSED ANNEXATION AREAS AND FURNISH MUNICIPAL SERVICES
The court recognized the undisputed financial ability of Hattiesburg to make improvements and furnish services to the proposed annexation area.

5. THE NEED FOR ZONING AND OVERALL PLANNING IN THE PROPOSED ANNEXATION AREA
The chancellor stated that the city did not convincingly present a need for zoning and overall planning in the Lamar County area. The court found that a substantial portion of the Lamar County area sought to be annexed was already developed and that a substantial portion of the undeveloped area, such as the farmland, was subject to physical constraints.
At trial Hattiesburg emphasized that the proposed annexation area in Lamar County did not have the necessary level of overall planning and zoning needed for an urban area. James Borsig, Hattiesburg's director of planning and community development, testified that neither the Lamar County nor Forrest County annexation areas had any type of comprehensive plan nor zoning ordinance. He also testified that neither area had adopted a standard building code, a standard plumbing code, standard gas code, standard mechanical code, standard swimming pool code, standard electrical code, national electric code, national fire prevention code, a standard fire prevention code or animal control ordinance. Hattiesburg admitted that Lamar County had subdivision regulations, but asserted that these were inadequate and that the county lacked the necessary enforcement power.
Oak Grove and Lamar County asserted that while Lamar County did not have the same type of zoning and planning as Hattiesburg, the zoning and planning it had was adequate, and that Lamar County has a network for planning and guiding growth. Its county planning commission reviews subdivision plats and surveys general growth patterns throughout the county. This commission meets monthly and reports to the board of supervisors. James Lee, president of the Lamar County Board of Supervisors, testified that the commission and the board work closely to insure that Lamar County has the services it needs and development occurs in a orderly fashion. The county also had a full-time planner who had resigned before the trial; the county was in the process of replacing him. Kelley stressed that Lamar County was a rural area, not an urban area, and that the area was not likely to develop much more in the near future. Farmers in the Lamar County annexation area indicated that they had no plans to stop farming on their land. Kelley and Gary Morris, the civil engineer for Lamar County, also testified that the Lamar County Subdivision Regulations were adequate for the development in Lamar County.
*824 One can not say that the chancellor's decision as to the need for zoning and overall planning in the area was manifestly wrong. Chancellor Dale had the authority to look at the area for himself and, in his opinion, the area proposed for annexation in Lamar County had no additional need for zoning and overall planning. Bassett, 542 So.2d at 921, citing McElhaney, 501 So.2d at 403; Extension of Boundaries of City of Biloxi, 361 So.2d at 1376.

6. THE NEED FOR MUNICIPAL SERVICES IN THE PROPOSED ANNEXATION AREA
Hattiesburg asserts that the area is in need of municipal services and capital improvements. The testimony of various Lamar County residents and experts at trial and many affidavits submitted after the trial supported Lamar County's claim that the residents were satisfied with the services they had and that such services were adequate for the area. The chancellor held that, with the exception of better fire protection, the area proposed to be annexed had adequate services. Because we find no manifest error in the chancellor's findings, we affirm his findings. Extension of the Boundaries of City of Vicksburg, 560 So.2d at 716, Bassett, 542 So.2d at 921, citing McElhaney, 501 So.2d at 403; Enlargement of Boundaries of Booneville, 551 So.2d at 892; Extension of Boundaries of Moss Point, 492 So.2d at 289.

a. FIRE PROTECTION
The Lamar County area is now served by several well-organized volunteer fire departments that work closely with each other. Their ability to respond to a major fire is questionable. The area presently has a Class 10 fire rating, while Hattiesburg has a class 5 fire rating for insurance purposes. This factor the chancellor properly considered in Hattiesburg's favor.

b. POLICE PROTECTION
The Lamar County area is now served by a sheriff and two deputies who regularly patrol the area.
Hattiesburg's witnesses testified that the county sheriff's department was fine for a rural area, but not for an urban area and that the area they proposed to annex was urban and needed the frequent police patrol that only municipal police departments can provide.
Many Lamar County residents testified, however, that they were satisfied with the protection provided by the sheriff's department and that the area was not urban and had a very low crime rate.
Hattiesburg could probably provide additional police patrol to the area, but is there a present necessity? In the chancellor's opinion, there was not and the lack of evidence demonstrating the inadequacy of the present police protection in the area supports his conclusion.

c. GARBAGE COLLECTION
Lamar County owns five garbage trucks, operates a landfill in the county, and provides once-a-week garbage pick-up. Hattiesburg provides garbage pick-up two and three times a week to its residents. Hattiesburg proposed to provide the area with the same pick-up service as it now provides city residents. Residents in the proposed Lamar County annexation area expressed no desire to have more frequent garbage pick-up and no one presented any evidence to show that the garbage collection in the area was inadequate.

d. STREET IMPROVEMENTS
The chancellor found that the streets and roads in the area were adequate and that the maintenance provided by the County was sufficient.
This finding is supported by substantial and credible evidence. All witnesses testified that the roads were in good shape. Hattiesburg presented some evidence of drainage problems in the area and overgrown ditches. The objectors admitted that they had had some problems with drainage and overgrown ditches but indicated that they were working to improve the situation.

e. WATER AND SEWER SERVICES
The proposed annexation area is presently served by several local rural water associations and private enterprises certificated by the Mississippi Public Service Commission. *825 Of the 23 square miles in the proposed Lamar County annexation area, only four square miles are not certificated by the Public Service Commission. Evidence revealed that this system is adequate for domestic water supply. If Hattiesburg were to annex the area, the city could not improve on the water service unless it acquired the private water associations or worked out an agreement with them. As of the time of the trial, Hattiesburg had made no such arrangements with the private water associations and certificated areas.
Lamar County provides sewage service to its residents pursuant to a "201 Facilities Plan," a program of the Bureau of Pollution Control and the Environmental Protection Agency in cooperation with the state government in an effort to provide sewer collection and treatment to several areas via a central sewage treatment facility. Those political subdivisions in the area participating in the program include Hattiesburg, Petal, Lamar County, and Forrest County. The city presently collects sewage from the Lamar Park certificated area and the Westover subdivision in Lamar County by agreement between Hattiesburg and the private Lamar County sewage treatment plants. Many residents also have their own septic tanks.
Experts testified that the current sewage system was adequate and presented no health problem to the area. Henderson, the sanitarian for Lamar County, testified that the soil allowed sufficient percolation.
The chancellor correctly found that there was no credible evidence showing the inadequacy of these systems.

7. THE EXISTENCE OF NATURAL BARRIERS BETWEEN THE CITY AND THE PROPOSED ANNEXATION AREA
The chancellor held that Interstate 59 and the county line separating Forrest and Lamar Counties should be considered as natural barriers.
Both parties and this Court agree that there are no true natural barriers between Lamar County and Hattiesburg. Extension of the Boundaries of City of Jackson, 551 So.2d at 865. Hattiesburg has annexed land in Lamar County and across Interstate 59 in previous annexations. Hattiesburg asserts, however, contrary to the court's opinion that neither the county line nor Interstate 59 should be considered as any kind of barrier to annexation. Borsig, the city's director of planning and community development, argued that the interstate would not impede the city's efforts to provide services. The city also emphasized that each day many Lamar County residents travel from their homes to Hattiesburg to work and think nothing of crossing the county line or Interstate 59.
Oak Grove and Lamar County contend that Interstate 59 and the county line indeed act as a barrier. The objectors pointed out that the city had never annexed land west of Interstate 59 except upon the invitation of developers and without opposition from the residents of the area. Oak Grove and Lamar County also argued that Interstate 59 would impede Hattiesburg's efforts to provide services to the proposed annexation area. The only accesses from Hattiesburg into Lamar County are West Fourth Street, the Highway 98 overpass, and Highway 11, which is eight miles south of downtown Hattiesburg.
The chancellor in considering the presence of Interstate 59 and the county line did not err. He noted that if there were other convincing evidence of the reasonableness of the annexation that the presence of Interstate 59 and the county line would not keep him from confirming the annexation. The chancellor simply observed that there are certain man-made barriers such as the interstate and the county line that should not be ignored. He is not manifestly in error, thus, we must affirm his findings. Bassett, 542 So.2d at 921, citing McElhaney, 501 So.2d at 403; Extension of Boundaries of City of Biloxi, 361 So.2d at 1376; City of Picayune, 238 Miss. 429, 117 So.2d 718.

8. THE CITY'S PAST PERFORMANCE AND THE TIME ELEMENT INVOLVED IN THE CITY'S PROVISION OF SERVICES TO ITS PRESENT RESIDENTS
Hattiesburg passed this test.

*826 9. THE INTEREST OF, AND CONSEQUENCES TO THE LANDOWNERS IN THE ANNEXATION AREA
The majority of the residents of the Lamar County area had no desire to be part of the city of Hattiesburg and wanted to maintain their quasi-rural lifestyle. The chancellor noted that large areas of territory in the proposed Lamar County annexation area were devoted to farming and that the prospects for substantial change in that situation appeared dim. He also found that incorporation of the Lamar County area would effect serious and substantial detriment to the landowners, especially the farmers. The chancellor stated that the residents of Lamar County were outside the city by choice and found that the residents had all the services they deemed necessary and that these services, with the exception of fire protection, seemed adequate. He concluded that from the standpoint of fairness and the balancing of the equities of all the parties that the scales were heavily weighted in favor of those who opposed annexation.
In Western Line Consolidated, 465 So.2d at 1059, the Court stated that the "economic and personal impact on these landowners is as important a concern as the city's need to grow" and that a chancellor must review the reasonableness of the annexation from the perspective of both the city and the landowner.
Hattiesburg contends, however, that the court put the desires and interests of the residents of Lamar County above those of the city's. Hattiesburg contends that the court's whole opinion centered around this one factor.
Upon examination of the record and the chancellor's findings, however, it is clear that the chancellor accorded the proper weight to this factor of reasonableness. The people living in the proposed annexation area did not want to be a part of Hattiesburg. They wanted to maintain their rural lifestyle. They liked living in the area because the people were friendly, there was a good school close by and there was a sense of community among the residents. Some feared that if the area were annexed, they would lose their sense of community and identity.
The evidence also showed that if the area were annexed that the residents would have to pay more taxes. Those hardest hit would be the farmers. A substantial portion of the land included in the proposed annexation area is farmland.
It is evident that the court did not just blindly hold that Hattiesburg could not annex the 23 square miles in Lamar County that it proposed to annex because the residents of Lamar County did not want to be brought into the city. The residents of the proposed annexation area had valid reservations and concerns that the court had to consider. Looking at the record as a whole, the chancellor fairly balanced the city's interest with the interests and consequences to the landowners in the proposed annexation area.
This Court has no basis on which to reverse the chancellor's opinion as to the reasonableness of Hattiesburg's annexation request. It is obvious that the chancellor spent an enormous amount of time reviewing the evidence and inspecting the areas that Hattiesburg wanted to annex. Where there is conflicting evidence, this Court must give great deference to the fact finder. The chancellor heard the evidence first hand and had the invaluable benefit of inspecting the areas. Under our limited standard of review, this Court must affirm the chancellor's decision. Extension of the Boundaries of City of Vicksburg, 560 So.2d at 716, Bassett, 542 So.2d at 921, citing McElhaney, 501 So.2d at 403; Extension of City of Biloxi, 361 So.2d at 1376; City of Picayune, 238 Miss. 429, 117 So.2d 718.

B. ERRONEOUS STANDARDS
Hattiesburg also argues that the chancellor applied erroneous legal standards in determining the reasonableness of the annexation and thus, this Court is not limited to a substantial evidence standard of review. Clardy v. National Bank of Commerce of Mississippi, 555 So.2d 64 (1989). Hattiesburg contends that the court erred *827 because it required the city to prove that the Lamar County area was in a primary path of growth rather than a path of growth; to prove that there were existing rather than potential health hazards in the area; and to prove a compelling need for municipal services. The city also alleges that the court erred in that it failed to consider the city's financial ability to provide the services promised.
Hattiesburg's allegation that the chancellor applied the wrong criterion in determining if the area sought to be annexed was reasonably within the path of growth of the city is without merit. Chancellor Dale considered all the city's potential paths of growth and found the areas which in his opinion were reasonably within the path of growth or in his words, those areas that were reasonable paths of growth. He considered such things as location of major thoroughfares, plans for future development in an area, and whether or not the area was already developed. The chancellor's written opinions on this issue are complete and logical. He fully considered the evidence presented on the matter.
Hattiesburg's allegation that the chancellor erred because he required that the city prove that there were existing as opposed to potential health hazards in the proposed annexation area is also without merit. There is nothing in the body of his opinion that even suggests that he applied the wrong standard.
Hattiesburg's allegation that the chancellor required that the city prove a compelling need for municipal services in the area is also without merit. Once again, the chancellor's written findings on this issue are thorough and complete. The chancellor detailed the services the Lamar County area had at the time. He noted certain deficiencies in some areas such as fire protection. He noted that most services already provided to the residents of Lamar County were adequate. In his supplemental opinion, he found that a small commercial area immediately adjacent to the city along Highway 98 and the area west of Interstate 59 known as the Shadow Wood/Richburg area would benefit from municipal services.
Finally, also without merit is Hattiesburg's argument that the chancellor failed to consider the city's financial ability to make improvements and furnish services to the Lamar County area. The chancellor found that the city had substantial bonding ability and an adequate tax base. In writing his opinion, he chose not to dwell on the issue because the city met this test.
Because the chancellor in applying correct legal standards reached a decision we can neither say is manifestly wrong nor unsupported by credible evidence, we must affirm. Extension of the Boundaries of City of Vicksburg, 560 So.2d at 716; Bassett, 542 So.2d at 923; Enlargement of City of Booneville, 551 So.2d at 892; McElhaney, 501 So.2d at 406; Extension of Boundaries of Moss Point, 492 So.2d at 290; Enlargement of Yazoo City, 452 So.2d at 838; Extension of Boundaries of City of Clinton, 450 So.2d at 89; Curet, 399 So.2d at 1352.

II. OAK GROVE AND SHADOW WOOD'S APPEAL
Oak Grove and Shadow Wood appeal the court's decision to annex the Lamar County commercial property belonging to James Richard West, Warren A. Hood, Jr., R.L. Kemp, Jr., and Kemp Company, Inc., which lies south of Highway 98 and adjacent to the present city boundaries and the area which lies east of Interstate 59 in sections 24 and 25 of Lamar County. The Shadow Wood area includes approximately thirty residences and a few commercial developments.
Both contend the chancellor erred when he considered the motions for reconsideration of several persons who owned property in the area, yet had not participated in the trial, arguing the movants had no standing. They also argue the chancellor erred in considering these motions after rendering his September 26, 1988 opinion. The movants had standing. Sperry Rand Corp. v. City of Jackson, 245 So.2d 574 (Miss. 1971).
*828 Oak Grove and Shadow Wood's argument that the chancellor erred when he reconsidered his opinion is likewise without merit. As above noted, there had been no final judgment. It was within the chancellor's discretion to hear the motions for reconsideration and to correct or amend his findings. Warner's Griffith, Mississippi Chancery Practice, (Rev.Ed.), § 632. In equity, the chancellor has always had entire control of his orders and decrees and authority to modify or vacate any of them on motion of any party, or on his own, prior to final judgment. The rules of Civil Procedure do not change this basic authority which rests in any chancellor or circuit judge as to any case in his court. The chancellor was eminently fair to all parties in deferring the final decree until all interested parties could be heard.
Shadow Wood also argues that there was no evidence to support its annexation, and the annexation was unreasonable.
There is substantial evidence supporting the chancellor. Shadow Wood is located to the immediate west of the area known as the Tatum Development. This 1,800 acre area is owned by private developers who plan to develop it into a planned community which upon completion will have approximately 3,000 housing units as well as retail, office, medical, educational, institutional, and recreational facilities. Also, Shadow Wood is east of Interstate 59 and contiguous to the west city limits. This Court certainly cannot say that the chancellor's decision to annex the Shadow Wood/Richburg area was manifestly wrong or unsupported by substantial, credible evidence.
It was the function of the chancellor to make a thorough study of the reasonableness of the proposed annexation. He clearly did so. He conducted a full hearing, gave all parties wide latitude in testifying and producing exhibits. He personally inspected all areas relevant to his decision. Then, and only then, he rendered his final opinion which reflects the fullest deliberation and careful, painstaking thought.
We find no error, and affirm.
AFFIRMED ON ALL APPEALS.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PITTMAN and McRAE, JJ., concur.
ROBERTSON, PRATHER and BANKS, JJ., concur in part and dissent in part with written opinion.
SULLIVAN, J., not participating.
*829 
*830 ROBERTSON, Justice, concurring in part, dissenting in part:

I.
If you look at a map, the political boundaries removed, you will think Oak Grove[1] a part of Hattiesburg. If you drive through the area, Oak Grove will appear residential Hattiesburg. The phone company treats Oak Grove and Hattiesburg as one, Hattiesburg being the one. The Post Office has not given Oak Grove a zip code. If you follow the average Oak Grovian around, day by day, you will find that he works, plays, shops in Hattiesburg  everything but "sleeps and pays taxes," and you will wonder why Oak Grove is not politically a part of Hattiesburg.
Hattiesburg demands more than Oak Grove  some twenty-three square miles all in Lamar County. A strong case can be made that the rural, largely unpopulated area to the southwest of town should be left out.[2] My concern is the area lying immediately west of present corporate Hattiesburg, that bedroom community that has grown up over the last several decades that is so parasitic upon Hattiesburg for its livelihood, if not its existence. The majority finds 6,315 people living in Oak Grove. The record suggests more, but the numbers are not what matter. Some ninety-five (95%) percent of Oak Grove's people work in Hattiesburg,[3] and most of those people shop and recreate there as well. Hattiesburg provides waste water treatment services to the independent waste water systems which serve forty (40%) percent of Oak Grove's homes. And so much more.
The Chancery Court has decreed an unreality. Today we refuse to disturb that decree, as though we may create on paper and through words what, in fact, has no existence. Oak Grove is not an independent community, and nothing we may say may make it so. Any decree to that effect may only be called clearly erroneous, manifestly wrong, if not bizarre.

II.

A.
I concede it is much too late to deny that annexation, a function historically and generically legislative, has a judicial component. Statute law charges chancery court review annexation ordinances under a lone standard  is it reasonable? Miss. Code Ann. § 21-1-33 (1990 Recompiled). See also, In re Boundaries of City of Vicksburg, 560 So.2d 713, 715 (Miss. 1990); Ritchie v. City of Brookhaven, 217 Miss. 860, 872, 65 So.2d 436, 440 (1953). Over the years the judicial eye has seen eleven indicia of reasonableness, plus a catch-all "any other," and the majority correctly recites these.[4]See In re Enlargement of *831 Corporate Boundaries of City of Booneville, 551 So.2d 890, 892 (Miss. 1989); In re Extension of Boundaries of City of Jackson, 551 So.2d 861, 864 (Miss. 1989); Bassett v. Town of Taylorsville, 542 So.2d 918, 921-22 (Miss. 1989). These indicia are the product not of logic nor fiat but of our experience. No one suggests all have been stated nor that their number is finite. Of late, we have been careful to emphasize that these indicia are not to be viewed in isolation, are not talismanic tests in and of themselves, but are to be seen as guides or aids to the general judicial inquiry whether the annexation ordinance be reasonable. In re Boundaries of City of Vicksburg, 560 So.2d at 715; Bassett, 542 So.2d at 921. If a fact goes to the reasonableness of the annexation, we must consider it, and we care not that Dodd v. City of Jackson, 238 Miss. 372, 118 So.2d 319 (1960), nor any of our more recent cases did not mention the matter.

B.
Consider in this setting the majority's treatment of one of the long seen indicia of reasonableness: the city's need for expansion. Unhinged from reality, the discussion seems sensible enough. Substantial evidence below shows that Hattiesburg  defined geographically by its pre-annexation corporate limits  does not need growth space. Population growth within present Hattiesburg has been modest of late. Population density is down from ten years ago and is relatively low compared to other cities of similar size. Besides, the Court below approved annexation of twenty-two square miles in Forrest County, much of which is the Tatum Development, a planned residential area south of the city's pre-annexation boundaries and south of Highway 11. Hattiesburg does not need additional area  Oak Grove  for expansion. Even if it did, how could that need be filled by an already populated area? Hence, the majority's antiseptic summary: "the chancellor's opinion as to the city's need for expansion is supported by substantial and credible evidence."
But strip away the legalisms. Think in terms of Section 21-1-33 reasonableness, and look at what has happened in the world of Hattiesburg and eastern Lamar County over the last two decades or so, and an altogether different reality emerges. The reason Hattiesburg proper has had little population growth is that Greater Hattiesburg has grown in Oak Grove. The reason Hattiesburg's population density is down is that its people have moved a stone's throw to the west to Oak Grove. The reason the Tatum Development has not developed and is available for future expansion is that its supply of available land has not been nearly so attractive socially or economically as Oak Grove. The reason Oak Grove is not available today for Hattiesburg's expansion is that Hattiesburg has already expanded there, with people who in every socio-economic sense are and have long been a part of and dependent upon Hattiesburg for their livelihood. The reason all of this has *832 happened is that the overwhelming majority of Oak Grovians  today's Objectors  are like most of the rest of us when the chips are down, and, having seen a way to enjoy the benefits of life in Hattiesburg without any of the costs, have opted out. No more city taxes. No more need to worry about racial minorities  politically, educationally or otherwise.
The finding of the Court below is simply wrong.

C.
Look at another of our long recognized indicia of reasonableness: whether the area sought to be annexed is in the city's path of growth. Oddly, the Chancery Court failed to find Oak Grove in Hattiesburg's path of growth. I say "oddly" because the evidence is overwhelming not just that Oak Grove is in Hattiesburg's path of growth, but that Oak Grove is Hattiesburg's growth. In recent decades, the major residential growth of Greater Hattiesburg has been westward from the current city limits  toward, in and beyond what is now Oak Grove. Hattiesburg's failure is that it seeks to annex Oak Grove twenty years after it should have.
The majority focuses only upon the present  that slice of time captured at the June, 1988, hearing  and candidly concedes "the area in Lamar County that Hattiesburg seeks to annex is in the path of growth of the city." The majority gets around this reality by according the court below an unprecedented prescience and power. "The chancellor ... looked at all possible directions in which the city could grow ... and decided that the area near the southern boundary of the city in Forrest County would be a reasonable path of growth... ." What gives the court judicially reviewing a legislative act the power to thwart that act on such policy grounds is not mentioned, nor is it apparent. More intriguing is just what made the court below think it could in fact channel Hattiesburg's growth southward. What opinions the record affords suggesting such range from wishful thinking to pure fantasy, but somehow that is enough for the majority to say, "This Court cannot say that the chancellor's decision concerning the city's path of growth was manifestly in error." With deference, I suggest that decision is manifestly in error on at least three levels. It is manifestly erroneous (a) as a finding of fact, (b) as an interpretation and application of Section 21-1-33 reasonableness, and (c) as an alegal exercise of judicial review of a legislative act.

D.
Then there is the matter of natural barriers. One would have thought our focus should be upon the ridge to the west, for it is the only natural barrier in the area. The Chancery Court held that the Forrest-Lamar County line was a natural barrier, and it is certainly true that this is not a factor that need necessarily be ignored, though it be of political and not natural origins. On the other hand, Hattiesburg's annexation into Lamar County first occurred many years ago and, indeed, the self-same Chancery Court has in the past approved other excursions into Lamar County,[5] including another partial one today. We are furnished no articulable reason why the Lamar-Forrest County Line is any more or less of a barrier vis-a-vis Oak Grove than it has been in the past.
What's more, there is no evidence that Hattiesburg's prior annexations into Lamar County have created any ascertainable problems. In its opinion, the Court below imagined an effect upon "householders and school patrons and voters in the area sought" but gave us no clue what these might be. We addressed a similar concern in City of Jackson:
Concededly, county lines should not be crossed willy-nilly. Yet problems arising from the existence of the City of Hattiesburg in both Forrest and Lamar Counties are quite minimal. (Citation omitted) *833 The City of Baldwyn has long existed with the Lee-Prentiss County line dividing its main [business] district. Union straddles the Neshoba-Newton County line.
City of Jackson, 551 So.2d at 865-66.
A second would-be barrier, again not "natural," is Interstate Highway 59. It is true that I-59 is a conventional limited-access interstate highway. There are only three exits in the Hattiesburg area, and two cross-over bridges. What makes one think this constitutes I-59 a barrier between Hattiesburg and Oak Grove escapes me. Every major city in the United States today has a limited access interstate highway or freeway penetrating its center. These are conventionally thought desirable arteries for traffic. The fact that the overwhelming majority of Oak Grove's citizens find daily access to Hattiesburg a matter of ease and convenience would seem to give the lie to the notion that I-59 is any sort of barrier at all.

E.
Then there is the question of whether Oak Grove is but a bedroom community; that is, whether the substantial majority of the residents of Oak Grove have established their homes so that they might obtain all of the benefits of suburban life in the City of Hattiesburg without the burden of Hattiesburg taxation. Holmes thought taxes the price we pay for civilization. Oak Grove wants civilization for free.[6]
The majority recognizes that our cases have recognized, as an indicia of Section 21-1-33 reasonableness, whether the property owners and other inhabitants of the areas sought to be annexed, have in the past and for the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy the benefits of proximity to the municipality without paying their fair share of taxes. See Extension of the Boundaries of City of Jackson, 551 So.2d at 864; Texas Gas Transmission Corp. of City of Greenville, 242 So.2d 686, 689 (Miss. 1971); Kennedy v. City of Kosciusko, 203 Miss. 4, 8, 33 So.2d 285, 286 (1949); Wheat v. Town of Poplarville, 149 Miss. 424, 434, 115 So. 559, 561 (1928); Forbes v. Mayor & Board of Aldermen of City of Meridian, 86 Miss. 243, 252-53, 38 So. 676, 678 (1905). This is the factor that sensibly should dominate today's search for reasonableness. The majority says otherwise, taking seriously the Oak Grove suggestion that their community exists because "they wanted to maintain their rural lifestyle." Rural lifestyle no doubt has traditionally meant low property taxes, but I am not sure when it started meaning middle class suburban living with daily commuting into the city for employment and other socio-economic activity.

F.
Today's Objectors say they do not need the City's services, but while saying this, they and their neighbors have signed and filed in the Chancery Court of Lamar County a Petition for Incorporation.[7] Literally thousands of the Lamar County annexation area residents, including all of the individual Objectors except one, have signed the Petition, which stated in part:

*834 Petitioners would aver their purpose in seeking said incorporation is for the increase and improvement of the public services to the rendered to the inhabitants within the area sought to be incorporated; that they propose, if permitted to incorporate, to provide adequate fire and police protection, to provide sanitation services within said territory, to provide traffic control and regulations, to improve and promote recreational opportunities within the area, to provide more and better street lighting, street controls, as well as reasonable land use regulation. (Emphasis added.)
I can only read these words as Oak Grove's admission that it needs the municipal services Hattiesburg has to offer. A similar situation occurred in City of Jackson, wherein this Court stated:
Within our actual and judicial knowledge a considerable effort has been and is being expended to incorporate the area into the City of Ridgeland, although those efforts have been unsuccessful to date. So seen, the arguments that there is no need for municipal planning and services in the area or that the residents desire to continue pastoral lives as country folk appear quite disingenuous.
City of Jackson, 551 So.2d at 863.
So too, the objectors' claims in the present case, that they are satisfied with the ways things are, must be seen for what it is. For
... smoke screens removed, these appellants simply do not want to pay town taxes. They claim that there is nothing [the City] can do for them and that they will achieve no benefits from annexation. Each would have us ignore the benefits ... It is not unreasonable to suggest what these objectors want is representation without taxation. This is hardly the stuff which good citizens are made of.
Bassett, 542 So.2d at 922.
Without doubt, there is abundant evidence of the lack of need in many areas traditionally considered in annexation litigation, to-wit: the need for police and fire protection, protection against health and sanitation hazards, and the like. The people of Oak Grove say they have all of the "planning" they want, though it is doubtful we should take them seriously in view of their own incorporation petition. Still, crediting the claims, when we let these factors control the overall reasonableness determination, we ignore the last quarter of a century of suburban residential development in this state. Developers plan their subdivisions so that prospective homeowners will find they do not really have to leave Hattiesburg, and that they have sufficient streets, sewers and the like. Of economic necessity they must do so.
This factor is seen pernicious against the cry that the city is greedy with no interest but expanding its tax base.[8] The converse *835 is the reality. In this me-first era when so many would rather switch than fight, it is the people who move to areas like Oak Grove who drain the city of its tax base. If these same people did not continue to take advantage of everything Hattiesburg has to offer, there would be no grounds for complaint. No one questions a citizen's prerogative to build his home in the country and live off the land, but it seems a bit disingenuous for someone to build his home, not in the country, but right next door to the city and claim that it is the city that is greedy while the citizen continues to live off city while paying no taxes.

III.
There is another dimension. The Chancery Court approved annexation of the Forrest County Country Club area in northwest Forrest County. This area is demographically residential and in other respects the same as most of Oak Grove. One wonders on what rational basis the Court may approve the annexation of the Country Club area while disallowing the annexation of Oak Grove.
We are told, for one, that the Country Club area lies in Forrest County while Oak Grove lies in Lamar County. The two areas happen to adjoin one another, Country Club lying immediately north of and adjacent to Oak Grove. Their political division is wholly unobservable on the ground, and, as we have indicated, this hardly seems a rational basis for the distinction. Besides, including Country Club and excluding Oak Grove gives Northwest Hattiesburg a decidedly gerrymandered appearance.
Second, we are told that Oak Grove objected to annexation while Country Club did not. No doubt there is a practical reality here that may not be ignored, but the point need be thought about. Are we saying that, if the evidence is legally identical  as it is here, between County Club and Oak Grove  the Court has authority to decree one hundred percent opposite results? Are we saying that, if there is no objection to an annexation, the reasonableness function mandated by the statute is but a rubber stamp, that the Chancery Court has no serious obligation to inquire into reasonableness unless the annexee objects? Again, we do not doubt the practical reality that the Court is simply not going to have certain information opposed to the annexation where there is no vigorous objection, but surely this Court is not prepared to state to the world that the Chancery Court has no serious obligation to inquire into reasonableness where there are no objectors.
On the record before us, Country Club and Oak Grove are factually and legally identical, with the limited exception that Country Club is in Forrest County and Oak Grove is in Lamar County. To be sure, this does not automatically mean that both should be annexed. What it means is that each should be adjudged by the same legal criteria. Put otherwise, on today's record the annexation of Country Club and the exclusion of Oak Grove fits the classic definition of "arbitrary and capricious," the antithesis of reasonableness, the essential criteria upon which on judicial review we should review the annexation ordinance.

IV.
At oral argument one of the lawyers told us the 1990's would be the decade of annexation. Of late annexations have been quantitatively and qualitatively far greater than in years past, a fact within our actual and judicial knowledge. The numbers are striking. Nor are these mere incremental annexations. What was once unheard of and likely unthought has become commonplace: a municipality through annexation, seeking to double, treble or quadruple its corporate limits. See, e.g., Harrison County v. City of Gulfport, 557 So.2d 780, 781 (Miss. 1990); In re Boundaries of City of Vicksburg, 560 So.2d at 715; In re Enlargement of Corporate Boundaries of City of Booneville, 551 So.2d at 892.
The pendency of so many annexations raises two institutional concerns, and I regard it imperative that we address these:

A.
The first concerns the nature of annexation litigation. What we have done is force *836 a non-judicial function into the judicial mode, and the fit is a poor one.
The fixing of corporate boundaries, their enlargement or contraction, are "essentially" legislative functions. Marshall v. City of McComb, 251 Miss. 750, 755, 171 So.2d 347, 348 (1965). These were certainly historically legislative functions in the sense that, prior to 1892, they were handled by act of the Legislature. See Martin v. Dix, 52 Miss. 53 (1876); see also discussion in Western Line Consolidated School District v. City of Greenville, 465 So.2d 1057, 1060 (Miss. 1985); and particularly, Ritchie v. City of Brookhaven, 217 Miss. at 872, 65 So.2d at 440. We continue to give lip service to the idea that annexation is a legislative matter, e.g., In re Boundaries of City of Jackson, 551 So.2d at 863, but little more.
The fact is that annexation remains essentially, inherently, generically, legislative in nature. But beginning with the act of 1892, no doubt passed out of pragmatic recognition that it simply was not feasible for the Legislature to pass upon annexation questions, we have pretended and inaugurated another reality. What was needed was a forum  a legislative forum  where people and planners and local politicians could come and present their points. The Legislature in Jackson was not a feasible forum. On the other hand, every county had a courthouse and, first, a circuit, and then a chancery court, and these were accessible. No matter that legislative decision-making was foreign to the way those courts were set up and run. Part of the annexation job was given to the courts.
All of this raised a serious delegation of authority problem, and, to avoid a constitutional separation of powers infirmity, Ritchie v. City of Brookhaven in 1953 held "reasonableness" a judicial question. What this means is that we have gotten annexation law into a legalistic posture where the question of "public convenience and necessity" is a legislative question to be determined by the municipal governing authority, see, e.g., Bassett, 542 So.2d at 920; Western Line, 465 So.2d at 1060; City of Jackson v. Town of Flowood, 331 So.2d 909, 911 (Miss. 1976), while "reasonableness" is a judicial question to be determined in Chancery Court and ultimately in this Court on appeal. We seriously say public convenience and necessity is a legislative question not subject to judicial review, while reasonableness is somehow different. But can it be argued that these questions differ in nature, nor in proper process for pursuing answers? Notwithstanding, we divide them, and the dichotomy, translated and applied, leaves the state's annexation decision-making mechanism saying to the world today that the public convenience and necessity require that Oak Grove be annexed into Hattiesburg, but it is nevertheless unreasonable that this be done. With deference, this sounds silly, and it is.
I do not for a minute suggest that we overrule Ritchie. There was no doubt a time when a solid constitutional argument could and was made that annexation was sufficiently non-judicial that the courts have no authority to touch it. The point is settled to the contrary, and perhaps for the best. It is not the fact that courts are in the annexation business at all that is the problem but the fact that we have forgotten that our function in the annexation process is that of judicial review of the essentially legislative action of a municipal and administrative body, and not that of trial de novo of "reasonableness."
At its most fundamental level, those exercising legislative functions address the good, and not the right. They act out of a majoritarian concern with what is best for the community overall. Their calculus is inherently utilitarian. Fairness to minorities is a part of the greater good but this is so in a sense wholly distinct from the legal right courts normally accept and enforce. Western Line was correct when it recognized that fairness to citizens and property owners being annexed was an indicia of reasonableness, but we err when we expand that into a right not to be annexed, a wholly different animal. If anything is clear from our cases, it is that no person has a right not to be annexed. See, In re Extension of Boundaries of City of Vicksburg, 560 So.2d at 716; City of Jackson, *837 551 So.2d at 863, 869; Bassett, 542 So.2d at 922; In re Enlargement of Boundaries of Yazoo City v. Yazoo City, 452 So.2d 837, 841 (Miss. 1984); In re Extension of the Boundaries of the City of Clinton, 450 So.2d 85, 89 (Miss. 1984); Texas Gas Transmission Corp. v. City of Greenville, 242 So.2d at 690; Bridges v. City of Biloxi, 253 Miss. 812, 823-24, 178 So.2d 683, 687 (Miss. 1965); Walker v. City of Moss Point, 252 Miss. 511, 516, 175 So.2d 173, 175 (Miss. 1965); Dodd v. City of Jackson, 238 Miss. at 395-97, 118 So.2d at 330; Kennedy v. City of Kosciusko, 203 Miss. 4, 33 So.2d 285 (Miss. 1948).
Our judicial officers err when they blur (when they see at all) the distinction between (legitimate) objections to an annexation's reasonableness and the (illegitimate) defense of the (legally non-existent) right not to be annexed. On judicial review, we must accept we are reviewing a judgment of public policy and remember the fact. The reasonableness inquiry must always and may only be made against the backdrop of this realization and this question: Is this annexation good public policy?
All this has to do as well with our approach to the facts. We are and ought be concerned more with legislative facts than adjudicative facts. Strict rules of evidence ought and should be relaxed. More basically, we should ground our decisions in the same sort of facts legislators ground their legislative judgments, a point we have recognized in other settings. See, e.g., Luter v. Hammon, 529 So.2d 625, 629 (Miss. 1988); Thrash v. Mayor and Commissioners of City of Jackson, 498 So.2d 801, 805 (Miss. 1986); Board of Aldermen of Town of Bay Springs v. Jenkins, 423 So.2d 1323, 1327-28 (Miss. 1982). We should look out the window as much as we look at the record.
This Court's most immediate error of practice is that we spend our time struggling with an imagined duty of deference to the chancery court. Our annexation cases over the years well reflect this (misguided) struggle, which is wholly at odds with the received jurisprudence of judicial review and with our practice in every other area I know anything about where we are called upon to review agency actions within another department of government. See, e.g., Gill v. Miss. Dep't of Wildlife Conservation, 574 So.2d 586 (Miss. 1990); Magnolia Hosp. v. Miss. State Dep't of Health, 559 So.2d 1042 (Miss. 1990). When judicial review is committed ab initio to our circuit or chancery courts, we act de novo on final review. Mississippi State Tax Comm'n v. Moselle Fuel Co., 568 So.2d 720, 722 (Miss. 1990); Barnes v. Board of Supervisors, DeSoto County, 553 So.2d 508, 510 (Miss. 1989); Mississippi State Tax Comm'n v. Dyes Investment Co., Inc., 507 So.2d 1287, 1289 (Miss. 1987).
Zoning is an area where we have done it right. Zoning is a legislative function no less than annexation. Municipal corporations through their governing bodies pass (re)zoning ordinances the same as they enact annexation ordinances. Judicial review lies in the circuit courts, with final appeal here. What is crucial is that in zoning cases our circuit courts accept the limits of judicial review. They do not try ab initio the reasonableness vel non of the zoning ordinance. They affirm if they find the issue fairly debatable, a standard according the enacting authority great deference. We hear the further appeal de novo in the sense that we do not defer to the circuit court. Instead, our deference is to the zoning authority and we, too, uphold the ordinance if we find its wisdom and legality fairly debatable. See, e.g., Barnes v. Board of Supervisors of DeSoto County, 553 So.2d 508, 510 (Miss. 1989); Cooper v. City of Picayune, 511 So.2d 922, 923 (Miss. 1987); Saunders v. City of Jackson, 511 So.2d 902, 906 (Miss. 1987); Board of Aldermen of City of Clinton v. Conerly, 509 So.2d 877, 885 (Miss. 1987); Thrash v. Mayor and Commissioners of City of Jackson, 498 So.2d at 805-06; Woodland Hills Conservation Association v. City of Jackson, 443 So.2d 1173, 1179-82 (Miss. 1983).
We would do well to take a lesson from our sister state of Missouri. With a statute like ours, Missouri mandates that its courts inquire regarding the "reasonableness" of the annexation. Compare Mo. Ann. Stat. § 71.015 (Vernon 1991) to Miss. *838 Code Ann. § 21-1-33 (1990 Recompiled). Unlike us, Missouri handles judicial review of reasonableness correctly.
... it has been the universal rule that the court does not, in any sense, substitute its discretion or judgment as to the advisability or propriety of the annexation for that of the legislative body of the city, and that it does not review the legislative discretion; its consideration of "reasonableness" is confined to a determination of whether there exists a sufficient showing of reasonableness to make that question, at the least, a fairly debatable one; if there is such, then the discretion of the legislative body is conclusive. State ex inf. Taylor ex rel. Kansas City v. North Kansas City, Banc, 360 Mo. 374, 228 S.W.2d 762; Faris v. City of Caruthersville, Mo. App., 301 S.W.2d 63; State ex inf. Mallett ex rel. Womack v. City of Joplin, 332 Mo. 1193, 62 S.W.2d 393; Dressel v. City of Crestwood, Mo. App. 257 S.W.2d 236. The function of our courts, historically, has been merely to determine, in the light of these principles, whether the exercise of the legislative powers has been arbitrary and clearly unreasonable. (See the cases just cited.) Only to this extent do our courts consider the reasonableness of an annexation.
City of St. Joseph v. Hankinson, 312 S.W.2d 4, 8-9 (Mo. 1958).
What has happened here is that we have forgotten these points. In 1950 the Legislature placed reasonableness in the chancery courts. Miss. Laws, ch. 491 (1950). We took the first tentative right step, accepting that an annexation ordinance is a local governing authority's presumptively valid exercise of legislative power. Town of Crystal Springs v. Moreton, 131 Miss. 77, 90, 95 So. 242, 243-44 (1923). Soon thereafter we fell into error, as judges and lawyers began treating annexations like lawsuits, forcing square pegs into round holes, if you will. Without thinking, and almost reflexively, we try annexation cases by strictures of law, rules of evidence, and conventional limitations upon appellate review. In so doing we have strayed from the beaten paths of law and logic and have further distorted an already bastardized process.

B.
There is a second institutional problem we must address. In this last decade of the Twentieth Century, is our present constitutionally imposed dichotomy of municipal versus county governments itself reasonable and consistent with the public convenience and necessity? No doubt there was a time when city governments and county governments had their separate places, played their roles, with little friction. The level and complexity of government desirable in areas of concentrated population was concededly quite different from that needed in rural agrarian areas.
Life has changed since those simpler days. For one thing, many of our cities have their Oak Groves: bedroom communities where the overwhelming majority of citizens have fled to avoid taxes and, as well, life in pluralistic political and educational and social settings. Under our present structure, I have little sympathy with these individuals and would ordinarily annex them in a heartbeat. I recognize, however, that there is a fundamental structural problem which need be addressed and that is the duplication or overlapping of layers of local government. It is easy to see why Oak Grove and Hattiesburg ought be a part of the same governmental unit, indeed, it escapes me how anyone can seriously suggest otherwise. What is harder to show is why the people of Oak Grove and, for that matter, Hattiesburg, as well, need to be governed and taxed twice at the local level. Why do these people need two layers of local government, the county and the city? When we look at the annexations we have approved in Vicksburg, see In re Matter of Boundaries of City of Vicksburg, 560 So.2d at 715, in Booneville, see In re Enlargement of Corporate Boundaries of City of Booneville, 551 So.2d at 892, and even in that part of the annexation we approve for Hattiesburg today, we cannot help but doubt that the public interest is being served by these enlarged areas being governed twice locally. *839 The pendency of so many massive municipal annexation efforts around the state renders it imperative that this matter be addressed.
One familiar idea is the metro government, the conjoining of city and county governments for a particular metropolitan area so as to avoid overlap, duplication, inefficiency and waste. The idea is nothing new in other states. Decades ago, people elsewhere have seen that a single consolidated local government may provide more efficiently and more effectively services like law enforcement, parks and recreation, garbage collection, and utilities along city boundaries. Metropolitan government has worked well in populous states like Florida. We have it on good authority that it serves well in more rural states like Montana. Reports from Tennessee are that the Nashville/Davidson County metro government has greatly enhanced the progress and development of the Greater Nashville area.
These changes are well beyond the judicial competence. They would require legislative if not constitutional revision.[9] But the problem of duplicated and overlapping government must be addressed if this decade of the 1990's  declared by counsel as the decade of annexations  is to leave urban and suburban Mississippi a better and not a worse place to live.

V.
On direct appeal, I would reverse and render. I concur in our affirmance on cross appeal.
PRATHER and BANKS, JJ., concur.
NOTES
[1] This Court's most recent decisions recognize twelve factors to be considered by the chancellor. See Extension of the Boundaries of City of Jackson, 551 So.2d 861, 864 (Miss. 1989); Bassett, 542 So.2d 918, 921 (Miss. 1989). The other factors include the impact of the annexation upon the voting strength of protected minority groups; whether the property owners and other inhabitants of the areas sought to be annexed, have in the past and for the foreseeable future unless annexed, will, because of their reasonable proximity to the corporate limits of the municipality, enjoy the benefits of proximity to the municipality without paying their fair share of taxes; and any other factors that may suggest reasonableness.
[1] Within "Oak Grove" I include Westover and all other developed residential areas in the Lamar County portion of the annexation ordinance today at issue.
[2] I find it curious Hattiesburg would seek this seemingly uninhabitable area to the southwest, and at once eschew the eminently annexable Lake Serene area just a bit beyond Oak Grove. And then there is Canebreak.
[3] In fact, many of the Objectors themselves are employed in the City of Hattiesburg. Among them are a veterinarian and a professor, both of which travel daily into the City of Hattiesburg for their livelihood.
[4] These include (1) the municipality's need for expansion, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) the potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised, (5) the need for zoning and overall planning in the area, (6) the need for municipal services in the area sought to be annexed, (7) whether there are natural barriers between the city and the proposed annexation area, (8) the past performance and time element involved in the city's provision of services to its present residents, (9) the impact (economic or otherwise) of the annexation upon those who live in or own property in the area proposed for annexation, (10) the impact of the annexation upon the voting strength of protected minority groups, and (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and for the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy the (economic and social) benefits of proximity to the municipality without paying their fair share of taxes.

City of Jackson, 551 So.2d at 864. At the most recent Mississippi Trial and Appellate Judges Conference, H. Hunter Twiford, III and A. Jane Heidelberg offered a thoughtful reformulation of these indicia.
1) The benefits to be gained by the city and its residents, old and new, from expansion.
2) Whether the area to be annexed is in such proximity to the city that it has been benefited or is likely in the reasonably foreseeable future to be benefited by future development attributable to its proximity.
3) Whether the municipality and/or the annexation area will benefit from the provision of municipal level services, including exercise of municipal police power and regulation to solve problems that exist or are likely to exist in the reasonably foreseeable future.
4) Whether, given the city's history and financial status, the promised level of services can and will be provided to the annexation area within a reasonable time.
5) Given all of the above, whether the exercise of municipal regulation and police power will unduly burden some part of the annexation area.
6) As a final test, if annexation of the area found to be reasonable under the first five tests would dilute the voting strength of minority residents, the chancellor should either reject the annexation as a whole or reconsider the areas that would have been excluded as unreasonable, to see if their inclusion would reverse the dilution.
H. Twiford, III & A. Heidelberg, Mississippi Municipal Annexations, An Update  Circa 1991, 73-75 (April 1991) (unpublished manuscript) [hereinafter Twiford & Heidelberg].
[5] In re Enlargement of Corporate Limits of City of Hattiesburg, No. 11,512 (Lamar County Chancery Ct., June 10, 1985); In re Enlargement of Corporate Limits of City of Hattiesburg, No. 9858 (Lamar County Chancery Ct., May 4, 1981); In re Enlargement of Corporate Limits of City of Hattiesburg, No. 9,112 (Lamar County Chancery Ct., January 29, 1979).
[6] I do not mean to suggest that all who find themselves situated near one of our cities and towns and who oppose annexation are selfish, self-centered Oak Grovians. Many annexation objectors fit an altogether different description. I refer to those who for decades have been country folk who have by and large lived off the land, who never dreamed of moving to town or doing anything other than maintaining and enjoying a rural life-style. I refer to those who have made their homesteads without reference or thought to avoiding city taxes, politics or cultural pluralism. Indeed, many of these, who have not merely remained on the home place mom and dad left them, have consciously accepted the costs, risks and inconvenience of living many miles from town.

Under present law these persons have no more right to avoid annexation than any others. Their plight is a matter of legislative concern, as is the Oak Grove phenomenon. I regard it the legislative prerogative and responsibility to address and redress the legitimate annexation concerns of our state's bona fide country folk.
[7] In The Matter of The Incorporation of The City of Oak Grove, Lamar County, Mississippi, No. 12,318 (Lamar County Chancery Court filed June 12, 1987).
[8] H. Hunter Twiford, III and A. Jane Heidelberg gave a graphic description of reality in cities potential annexees see only as greedy. We quote:

Recent studies have detailed the plight of small businesses in small cities. A chain supermarket or discount store, such as the local Wal Mart, will wound, certainly severely and perhaps fatally, numerous downtown small businesses, which reduces the number of middle class small business owners, while increasing the number of lower income hourly jobs. Profits leave the local community. Empty storefronts eventually blight the older areas where lot sizes and lack of parking make redevelopment for major commercial use economically unfeasible. Marginal businesses, such as pawn shops, take over on the first floors of the empty space, unless the property is suitable for use by "symbol analysts," who normally require only relatively small spaces with little parking.
In short, our culture works against the continuous vitality of a city. As existing property ages, it becomes less desirable and more expensive to maintain. It is used by people of lower income who cannot afford to maintain it, and through each stage, existing structures become more dilapidated. People who can afford to move away from urban blight and the problems of the poor do so, and are replaced by the poor. Tax revenues decline, and the city is no longer able to afford the provision of high level municipal services to its residents which are also necessary to attract new commercial and industrial growth. The costs of provision of services increases, both from inflation and increased age of the city's infrastructure. Eventually, cut off from growth, the city withers.
Twiford & Heidelberg, supra, at 9-10.
[9] At its most recent session, the Mississippi Legislature gave serious consideration to a constitutional amendment resolution which would have inaugurated a local option system of consolidated city/county governments. See H.C.R. No. 71, Reg.Sess., 1991. See also, footnote 3, supra.