513 So.2d 932 (1987)
CITY OF GREENVILLE
v.
FARMERS INC., et al.
No. 57776.
Supreme Court of Mississippi.
September 30, 1987.
*933 G. Kenner Ellis, Jr., Eugene M. Bogen, Greenville, for appellant.
James Robertshaw, Robertshaw, Terney & Noble, Hainon A. Miller, Greenville, for appellees.
Before WALKER, C.J., and PRATHER and ANDERSON, JJ.
WALKER, Chief Judge, for the Court:
The City of Greenville (Greenville) appeals from an order of the Chancery Court of Washington County declaring Greenville's annexation ordinance to be unreasonable. *934 We affirm in part, reverse in part, and render.
This case was previously before the Court in Western Line Consol. v. City of Greenville, 465 So.2d 1057 (Miss. 1985). Upon examining the chancellor's finding that the annexation was reasonable, we noted in that case that he had erroneously viewed his role as being only a ministerial one. We therefore remanded the cause for the chancellor, in his judicial role, to "balance the equities of the parties by weighing all relevant factors to determine if the city's claim of need is defeated by inequitable consequences to those in the annexation area." Id. at 1060.
The chancellor conducted a second hearing at which the parties were given the opportunity to supplement the evidence presented at the original trial. After considering all of the evidence and briefs of counsel, the chancellor found the annexation to be unreasonable. The evidence and the reasons for his finding are discussed in the chancellor's opinion:
Annexation proceedings pursuant to statute were filed by the City of Greenville on August 20, 1982. Following publication and objections, pretrial, and motions and lengthy hearings on the merits, a decision allowing and affirming the annexation was rendered by the trial court July 8, 1983. This decision was appealed to the Supreme Court, which rendered the cause to the trial court under Rehearing Opinion on March 6, 1985. In view of the Opinion of the Supreme Court, the trial court heard such further and additional evidence as the City and remaining objectors desired to present in August, September and October, 1985, called for and received additional briefs and hereby renders its decision.

.....
1. Greenville's Need For Expansion:
There has been no major change in the facts since the first hearing. Greenville's census population in 1960 was 41,502. In 1970, it was 39,648. In 1980, it was 40,613. There were six annexations between 1960 and 1980, which increased the area of the City 3.68 square miles, and added significant population. It is inescapable that the City has not been increasing in population; in fact, the population density inside the city limits has diminished since 1960, and the relatively stable total population count has only been sustained by the six annexations.

.....
Considered as a whole, the City of Greenville's "need to expand" is not the result of increasing population, but is the "urban sprawl" that has occurred outside the present city limits as a consequence of economics, and a deliberate policy, participated in by the City, permitting lands outside the corporate limits to develop urban character, utilizing municipal services. (This Court does not consider fire protection in the annexation area a service rendered by the City. Although 165 fire calls were answered by city forces in the annexation area between October, 1982 and July, 1985, these were made under a cooperation agreement between the City and Washington County, with the County paying $250.00 per call; it therefore appears to be a service provided by the County and not a humanitarian gratuity of the City).

.....
The undisputed testimony of the City's expert was that the present municipal limits are 85% built up. This hardly comports with Exhibit 46, Vacant and Developable Land, for my triangulation of the lands marked in yellow on the Exhibit within the corporate limits exceeds 15%. In addition, additional large open fields exist as shown in the aerial photograph, Exhibit 211. They may be below the 100 year flood plain, but could be developed at greater expense, as the same expert admitted in his testimony.
Further, casual travel through the City shows vacant lots, empty houses, stores and other structures. It is obviously beyond the financial capabilities of any objector or combination of objectors to pay the cost of an accurate survey of the City to develop the data to dispute the City's expert testimony.
It follows that Greenville's "need for expansion" relates to an internal need for *935 additional population, need to integrate areas in urban use, and need to enlarge the municipal tax base rather than because the City is "bursting at the seams," and the City's case is weak on this criteria.
2. Whether the Area to be Annexed is Reasonably Within the Path of Such Expansion.
The City of Greenville is bordered on the west by Lake Ferguson, connected to the Mississippi River; consequently, the only directions any development could occur are north, east, south and southwest as the River curves west. Urban development, whether it be termed growth, sprawl or spread, does exist at least clustered along the major roads and highways leading to and from the City to the north, east and south. The proposed annexation includes all these "fingers" and huge areas between, as the area proposed to be annexed "wraps around" the City from Lake Ferguson on the west, north of the City, east of the City, south of the City, and southwest of the City approaching the Mississippi River. If these fingers of urban development are to be termed expansion, then they at least are "in the path of growth," and some reasonable argument can be made to include the undeveloped areas between these "fingers," as the City proposes to do, comparing the factual situation that existed in Lowe v. City of Jackson, 336 So.2d 490 (1976), wherein an annexation of some 40 square miles was approved.
3. The Potential Health Hazard from Sewerage and Water Disposal.
Exhibit 42 shows the alleged health hazards detected by the City in the annexation area. Many of these are unsightly and doubtlessly unsanitary solid waste collection sites; some are raw sewerage; and all could perhaps contaminate drainage water affecting the municipal public health... . The City has a legitimate interest in controlling and eliminating these hazards to the extent that they are a genuine threat to municipal health, which to some extent would involve their distance from the municipality.
4. The City's Financial Ability to Make Improvements and Furnish Municipal Services as Promised.
The proof shows that the City is in sound financial condition, and with the projected revenues from the proposed annexation area, can well afford the modest if not meager capital improvements proposed and provide the requisite municipal services. There are two caveats here however. One is the City's actual and contingent commitment to the "Boeing Project" testified about by the witness Tommy Hart and others at the set of hearings after remand.
The City is now committed to a project of industrial development at the old airport facility owned by the City (which can provide 400 to 600 additional jobs), and it appears to involve a capital commitment totaling $17.8 million. The testimony was somewhat confusing to the Court, but apparently, the City is committed absolutely to a $2.5 million bond issue, the County to a $2.5 million issue, and $4.5 million should come from a state grant. This leaves $8.3 million to be raised otherwise, which seemed to the Court to pose a contingent risk against bond capacity to that sum, a condition not involved in the record at the first trial.
The Court computes as follows:

 Assessed Value Greenville Plus the
 Entire Annexation Area: $146,894,700.00
 General Obligation Bond Limit @10% $14.7 million
 General Obligation Bond Limit @15% $22.0 million
 Outstanding General Obligation
 Bonds[*] $4.345 million
 Committed Boeing Project Bonds $2.5 million
 Contingent Boeing Project $8.3 million
 Capital Improvements Annexation $5.105 million
 ______________
 Total $20.25 million

Considering that the capital improvements for annexation are only estimates, and that they were made prior to January, 1982, and cost increases since that time, there may well be little margin of safety under the 15% General Obligation Bond Limit.
The second caveat is that the foregoing figures are based on total approval of all the proposed annexation. The accountant for the City, Gary Gainpoletti, frankly testified *936 on cross-examination that the Mississippi Power and Light Steam Generating Plant in the extreme southwest corner of the proposed annexation area, added $4.4 million to the bonding capacity, and without it, the annexation was not feasible. The Court is of the opinion that little of the total proposed annexation area could be excluded without endangering the City's ability to make the capital improvements and furnish the services if the City is required to cover the contingent $8.3 million on the Boeing Project, and that is an unknowable contingency.
5. Balancing the Equities.

.....
While it may be of little importance, it is noted that generally, and in this case, the antagonists in an annexation case are not evenly matched. The City can and does make large sums available to pay engineers, planners, consultants, other experts and accountants to build its case. (For example, the Vicksburg Evening Post has revealed that that City has expended some $150,000 in its annexation bid to date, and the case has not come to trial on the merits. The Greenville Delta Democrat Times is endeavoring to obtain the information from the City of Greenville under the Open Records Act, unsuccessfully, so far as this Court has heard. The Open Meetings Act has been held not to apply to some proceedings involving annexation.) The Objectors, individually and collectively, usually do not have the financial resources to obtain the data to challenge the City's case, and in the past, most attorneys have considered Texas Gas Transmission Corp. v. City of Greenville, to heavily weight the law in favor of the City. Put in the vernacular, that case, rightly or wrongly, has been generally construed as holding "Quityer belly-aching; you've got city water and lights for emergency  that makes annexation reasonable  shuddup and pay yer city taxes."
Let us now endeavor to "weigh the equities" between the filing Objectors and the City in this case... .
1. Objector Hammett:
The Hammett Farmlands sought to be annexed are in Sections 12 and 13, Township 18 North, Range 8 West. Much of the land is in the 100 year flood plain, and the only access is across a bridge east of the annexation area  both these features have led to exclusion from annexation in past cases (citations ommitted). There is one residential trailer on the farm, with its own water and septic disposal. There is no showing that the sewerage disposal is a health hazard  but in the logic of Texas Gas, possibly it could become one, and that may be excuse enough for City control. (citation omitted) The lands are used for agricultural purposes, and it seems axiomatic that cotton and soybeans do not need, cannot use, street lights, fire or police protection, or indeed, any municipal service. The City does not propose to build any streets on the property or install any water or sewer lines thereon. The farm is on the outer boundary of the annexation area, and is not necessary for access to other proposed annexation areas. If annexed, such usual farming methods as aerial application and burning stubble are forbidden, or may be so. The burden of added municipal tax would make farming this property less competitive with other farms in an already marginal business. The Court concludes the equities balance in favor of the Objector, and this property should be excluded.
2. Objector's Farmer's Inc.:
Farmer's Inc. is located in the South half of Section 13, Township 18 North, Range 8 West. Its main office, warehouse, and storage structures are located on Lot 1 of Ashley Subdivision, bounded on the North by Old Leland Road, on the South by the Railroad; Farmer's Inc. owns other lands in the vicinity to the East and in Ashley Subdivision North of Old Leland Road and East of their business complex. No. improvements worth mention exist on the other properties. A major part of this Objector's business is the storage and sale of large quantities of anhydrous ammonia, a farm fertilizer that is highly toxic, volatile, and strictly regulated by the state. Objector has been at this location over thirty years, and has two large liquid ammonia storage spheres holding 213,000 gallons *937 each. State regulations require substantial high risk insurance coverage, which the proof shows cannot be obtained in the event of annexation, effectively forcing Objector to relocate or cease operations. The City does not propose any street, sewerage or water line improvements affecting Objector, who is served by a water line not adequate for a sprinkler system. Since the City seeks to annex lands East of Farmer's installation, any decision on balancing the equities between the Objector and the City could result in Texas Gas Transmission's famous "hole in the doughnut," and it is therefore necessary to discuss the annexation area East of this Objector before coming to decision.
The City proposes to annex all the South 1/2 Section 13, Township 18 North, Range 8 West, and all of Section 16 not presently in the City directly to the South. There is no road access internally from Section 13 into Section 16, and none is proposed by the City's capital improvement plan. Thus there is no access reason for South 1/2 Section 13 to be needed to annex Section 16, and the North 1/2 of Section 13 is not included in the annexation proposal, nor is any land east of the South 1/2 Section 13 included in the proposal. The original annexation study done for the City by the Engineers, Smith and Sanders, did not include the South 1/2 Section 13 for annexation. The South 1/2 Section 13 is physically composed of some Hammett property to the north, Fish Lake, Old Leland Road, Ashley Subdivision, the Railroad running east, and Ashley Second. Part of the lands are within the 100 year flood plain. The half section is traversed in a northeasterly direction by Texas Gas Transmission right-of-way and pipelines preventing urban use of part of the area. Moderate middle class houses, appearing to be mostly about WWII vintage and some trailers are located on most lots of the subdivision hugging Old Leland Road, with large open lands behind the houses used for gardens, horse pastures, sheep grazing, dove hunting and the like. Six building permits have been issued in the fourteen years between 1971 and 1985, 2 residential, 4 commercial, but whether these were for additions to existing structures, replacements or new construction was not revealed. No health hazards are noted by the City in this half-section. The subdivisions are served water by the City through a two-inch line, which is not sufficient for any fire protection purposes. The capital improvement plan does not propose a fire-protection-adequate water line in this area  no improvement at all. Four lots in Ashley Subdivision are presently served by City sewer, and the City in its capital improvement plan proposes to extend that to the gas transmission line, thus serving two additional lots, being six out of fourteen lots in Ashley Subdivision.
Considering and balancing the equities from all of the above, this is not a path of growth area  its development is some 40-50 years ago mostly. It is not needed for access to any other area; the City does not propose to provide adequate water for fire protection, or sewer service to the entire area, no street improvements, curbs or gutters; annexation would force the Objector Farmer's Inc. to close or move; such enjoyments as horse and sheep keeping and dove hunting would probably be stopped, and taxes raised substantially. Notwithstanding Texas Gas Transmission, the Court concludes on balance that it is unreasonable and inequitable to annex the South 1/2 Section 13, Township 18 North, Range 8 West.
3. Objector P.L. Bell, et al, d/b/a Highland Plantation:
This plantation lies in Sections 15, 16 and apparently 17 of Township 17 North, Range 9 West in the southwest of the proposed annexation area. It is kind of arrow-head in shape, pointing west, with a trailer part adjacent in the shaft-notch to the east. The land is used strictly for agricultural purposes, with a gin, seed house and tenant house used seasonally. No annexation lands are south of the plantation; Comet Delta's Plant and MP & L's Steam Generating Plants are to the west. It is traversed by MP & L Road running in a westerly direction from U.S. Highway Eighty-Two to the power plant. An access road to Comet Delta's facility runs northerly from MP & L Road to that facility. *938 Both MP & L Road and Comet Delta's access are county roads. The plantation farming operation has been in the hands of the same family over seventy years. The City provides no utilities to the plantation, and proposes no capital improvements on, nor affecting these lands. No health hazards were detected on the plantation. Along the northerly reach of the plantation lies the Main Line Mississippi River Levee, and north of the Levee are unoccupied river overflow lands at least until the water front of Lake Ferguson is reached. To the northeast lies Section 16, Township 18 North, Range 9 West  undeveloped unurbanized school lands. With no city services provided, offered, or needed, this plantation, outside the areas where urban development has occurred, probably should not reasonably be annexed  except as a corridor to reach the "big Bucks," Comet Delta and MP & L Steam Generating west of the plantation. Decision on balancing these equities will be deferred pending discussion of these plants to the west.
4. Objectors Comet Delta, Inc. and MP & L:
Comet Delta's rice mill is situated on lands adjacent to the south end of Lake Ferguson built up by Comet's predecessor above flood level to accomodate the plant  an expensive operation. MP & L's Steam Generating Plant, also on built up paid for land, is adjacent, south and west of Comet Delta... . A county owned and operated recreational facility lies to the northwest of the plants, with the River west of that. North of Comet Delta is a gut or bay of Lake Ferguson which provides river access to both plants. Comet Delta disposes of high B.O.D. plant wastes through the City's Sewerage Treatment Plant to the east, connected by a line constructed and owned by Comet Delta. No health hazards were found at either plant. The City does not propose any capital improvements to or affecting either facility. Both facilities, of necessity, have their own security and fire fighting equipment, personnel, and water wells, as well as a crossover water agreement between the plants. Under [a] Cooperative City-County Agreement the City has answered fire calls to Comet Delta and been paid by the County for the service. Neither facility provides access to any other annexation area; they are "at the end of the line," and a rather long reach from any urbanized area. They are west of the Levee, with flood prone lands northeast and southwest. There is a string of river-oriented industries along the eastern bank of Lake Ferguson northeast of these plants, generally movable in high waters until the industrial fill area is reached about a mile and a quarter to a mile and a half northeast of Comet Delta. Comet Delta testified it is in a highly competitive business, would not have located there if it had any inkling it might be annexed, does not need any city services, received and discharges about 600 eighteen wheel trucks a week, (unpleasant to say the least in any urban area) and cannot afford the additional tax. MP & L does not even object  for the obvious reason that the tax increase will simply be passed on to the ratepayers of this public utility. The Steam Generating Plant does not need any city services; its turbines require better quality water than the City makes; it must, and does, have its own police-security forces and fire fighting equipment and personnel, including fire wells and high power pumps. What benefit can MP & L get from annexation? What benefit flows to the ratepayers in Leland, Hollendale, Rolling Fork, Port Gibson, Vicksburg, Jackson or Canton, for example, from this proposed annexation? The incremental increase for each ratepayers in MP & L's service territory might appear so small as to be de minimus non curat lex, but the total, in the event of annexation would be in the vicinity of $1.5 million plus any additional school tax (As later discussed, present millage in WLCSD is 19.4 mils, last reported GMSSD millage in this record was 27 mils; assessment of MP & L Generating facility is $4.4 million, [Witness Gainpoletti]).
Yet a city needs a substantial commercial and industrial tax base to provide the necessary urban services. It is well understood that few residential subdivisions "pay their own way," particularly when public schools are included. The plants are *939 where they are partly because there are urban facilities for their personnel, and transportation and markets for their products, which exist because the City of Greenville is there. Before deciding time, let's consider the related public schools.
5. Objector Western Line Consolidated School District:
Western Line Consolidated School District, (WLCSD), has an area of some 300 square miles, generally south and east of Greenville's Municipal Separate School District, (GMSSD). The proposed annexation would "take" some three hundred of its present 2030 students and $39.9 million of its present $73+ million assessed valuation, mostly from MP & L's Steam Generating Plant and Comet Delta Inc. Presently in the state, WLCSD ranks 5th in wealth per APU, and GMSSD ranks 30th out of 154 Districts. Thus, WLCSD is in the top 4%; GMSSD in the top 20%. Annexation would move GMSSD into the top 15% and drop WLCSD way down. WLCSD levied 17.5 mils tax at the time of the first hearings, and 19.4 mils after reevaluation at the second hearings. GMSSD levied the maximum 27 mils at the time of the first hearing, and this was not updated at the second hearing. WLCSD spends some 18% more per pupil on instructional costs, and therefor appears to be more attractive to the financially mobile family. About the time Singleton-type desegregation orders affected both districts (1970), GMSSD had a 38.9% white enrollment; WLCSD had a 22.2% white enrollment; at the time of the first hearings (1982), GMSSD had a 19.3% white enrollment; at the time of the remand hearings, GMSSD had an 11.5% white enrollment; WLCSD had over 60% white enrollment. In the event the total annexation is approved, WLCSD will lose, in addition to ad valorem tax mentioned above, eleven teachers plus $212,000 in state minimum foundation support.
The desire of the City of Greenville and GMSSD to obtain additional funds and additional predominantly white students is understandable, as is the desire of WLCSD to maintain the "status quo." It is difficult to see that equity lies on either side. At the time of the first hearings, GMSSD offered to share the tax income from the Generating Plant so as to balance the revenues per student. At the hearings after remand this offer was withdrawn. The state's system of allotting the funds from such a utility as this Steam Generating Plant only to the children in the School District where the plant is situated  excluding the children right next door, but "across the fence," is not comprehensible to this Court; it encourages, particularly, annexations to involve power grabs for money. It does not seem equitable to seriously damage one school district for the financial advantage of another, and there is no judicially available remedy to "balance the equities" between them except Solomon's proposal of splitting the baby in two which does not, and never has, seemed practical. Since drawing a line through the middle of the plants (for instance) would violate the principle opposing half a lot in the City, half outside, and, in addition, create taxing and record keeping havoc, such an approach does not seem reasonable or equitable.
It is not possible to put the trial Court's experience from hearing and watching the witnesses into words in an opinion  the integrity and public concern of William Percy, President of the Greenville Municipal Separate School District; the dedication and sincerity of David Dunnaway, Superintendent of Western Line Consolidated School District; the quiet strength of the Mayor of Greenville, harassed to provide services with a very limited budget; the bias, or interest of some witnesses, the polished professional skill of others, but these do enter in the decision process.
This Court will now turn to a more general view of the annexation proposal. According to the date and projections of the City's expert urban planner, Dr. Lusteck, and expressed in acreage, we have the following:

 A) Total acres in the annexation: 11,990 acres
 B) Total acres in the annexation area
 presently in urban development uses: 3,490 acres
 C) Vacant and developable land in the present
 city limits: 549 acres
*940 D) Total projected additional acres needed for
 urban use by the year 2000 A.D.: 3,317 acres
 E) Annexation area acreage needed for urban
 use by year 2000 A.D. (D, 3317 acres minus C,
 594 acres): 2,768 acres
 F) Acreage in annexation area not needed for
 urban use by the year 2000 A.D. based on the
 projections of population and land use (A,
 11,990 acres minus B, 3490 acres, minus D,
 2768 acres): 5,732 acres.

a. Starting to the northwest of the present city limits, the City proposes to annex a portion of Section 2, Township 18 North, Range 8 West, outside the Mississippi River Levee, in the 100 year flood plain, not showing any urban development, no discovered health hazards, not needed for access to other annexation lands, upon which, nor to which are any municipal capital improvements existing or proposed.
b. Next, the Southeast 1/4 Section 33, Township 19 North, Range 8 West, on the northern edge of the proposed annexation. Mostly in the 100 year flood plain, in agricultural use, showing no urban development, no discovered health hazards, not needed for access, upon which nor to which are any municipal capital improvements existing or proposed.
c. Next, the East 1/2 Section 9, Township 18 North, Range 8 West is on the northeastern edge of the annexation area. It is also mostly in the 100 year flood plain, in agricultural use, with no urban development, no discovered health hazards, upon which nor to which are any capital improvements existing or proposed.
d. The same can be said for Section 12, Township 18 North, Range 8 West north of Irey's Subdivision and Hirsh Addition.
e. Section 16, Township 18 North, Range 8 West is school land, part in the present city limits. There is some part of the section along the western line not in the flood plain, and its southern line abuts U.S. Highway 82 East, where commercial use could occur. Otherwise, it is mostly in the 100 year flood plain, in agricultural use, with no urban development outside the present city limits, no health hazards, no existing or proposed municipal capital improvements.
f. The East 1/2 of Section 9, Township 17 North, Range 8 West, except for a little jut to the east by Marico Place Subdivision, is subject to the same foregoing factual analysis, with the addition of a Michigan-Wisconsin Gas Corporation line traversing it in a northeasterly direction.
Considering the fact that the proposed annexation exceeds the City's own projected acreage needs for urban development by the year 2000 A.D. by 5,732 acres, the authority already cited on flood plain lands, and balancing the equities between the City and the landowners of the parcels numbered "a" through "f" in sequence above, it is the opinion of the Court that it is not reasonable to permit the annexation of these parcels, with the exceptions noted.
In light of the areas this Court has concluded must be excluded from the proposed annexation as unreasonable and unfair, considering first, that the City is weak on criteria # 1  need for expansion, and consequentially, weak on criteria # 2, the path of that "expansion," and further considering also the already tenuous nature of the City's financial ability discussed in criteria 4 above, further affected by the exclusion of these areas, and considering criteria 5, the equities discussed under Objector P.L. Bell, et al d/b/a Highland Plantation and Objector WLCCD, it is the conclusion of this Court, under the law of the case set forth in the Remand Opinion, that the City of Greenville has failed to prove that, on balance, the equities preponderate in its favor, and the proposed annexation is reasonable. Therefore, the Complaint to Enlarge the Municipal Boundaries of the City of Greenville must be denied, without prejudice at cost of the Plaintiff.
The chancellor's determination that the annexation was unreasonable may not be disturbed unless it is manifestly wrong. McElhaney v. City of Horn Lake, 501 So.2d 401 (Miss. 1987); Extension of Boundaries of City of Moss Point v. Sherman, 492 So.2d 289 (Miss. 1986). When the evidence is conflicting, we will give great deference to the chancellor's finding. McElhaney, 501 So.2d at 403; Sherman, 492 So.2d at 290.
Criteria which the chancellor should consider in determining reasonableness include the following: 1) the municipality's *941 need for expansion, 2) whether the area sought to be annexed is reasonably within the path of growth of the city, 3) the potential health hazards from sewage and waste disposal in the annexed areas, 4) the municipality's financial ability to make the improvements and furnish municipal services promised, 5) the need for zoning and overall planning in the area, 6) the need for municipal services in the area sought to be annexed, 7) whether there are natural barriers between the city and the proposed annexation area, and 8) the past performance and time element involved in the city's provision of services to its present residents. McElhaney, 501 So.2d at 403-04. "Other factors, including the interest of, and consequences to, landowners in the annexation area are relevant. The economic and personal impact on these landowners is as important a concern as the city's need to grow. Only by reviewing the annexation from the perspective of both the city and the landowner can the chancellor adequately determine the issue of reasonableness." Western Line, 465 So.2d at 1059. "The common thread that must run through any reasonableness criteria is fairness." McElhaney, 501 So.2d at 404; Western Line, 465 So.2d at 1059.
After reviewing the chancellor's ruling in light of these factors, we cannot say that he was manifestly wrong in finding that the annexation of certain specific areas was unreasonable. We are of the opinion, however, that the chancellor was manifestly wrong in finding the entire annexation to be unreasonable. Having identified those areas for which annexation would be unreasonable, the chancellor should have denied annexation of those areas and allowed annexation of the remaining areas. Miss. Code Ann. § 21-1-33 (1972).
The chancellor's written opinion indicates the reason he denied the entire annexation: he was of the opinion that the city's contingent bond obligation and the exclusion of MP & L's plant from the annexation (and thus from the city's tax base) would render the city financially incapable of providing improvements and services to even a portion of the proposed annexation area.
Having reviewed the record carefully, we conclude that the chancellor was manifestly wrong 1) in finding that the contingent bond risk adversely affected the city's financial status, and 2) in finding that the exclusion of the MP & L plant rendered the annexation financially unfeasible.
Regarding the contingent bond obligation, economic development official Tommy Hart testified that the remaining funds necessary for the Boeing Project would "be secured from other sources, including other funding cycles for federal agencies and possibly the State of Mississippi." Considering this testimony, we are of the opinion that the chancellor relied too heavily on highly speculative evidence when he included an $8.3 million contingent bond liability in computing the city's financial ability to fund the annexation. In so doing he was manifestly wrong.
In regard to the financial impact of the exclusion of MP & L's plant from the annexation, the chancellor found that the city accountant "frankly testified that without [MP & L's plant], the annexation was not feasible." However, the record reveals that the city accountant only admitted that the loss of MP & L would adversely affect the city's bonding capacity and would significantly affect the feasibility of the annexation. This evidence is not sufficient to justify the chancellor's finding. While the accountant admitted the obvious  that the loss of MP & L would have an effect on bonding capacity and on the feasibility of the annexation  he did not testify, nor does other evidence indicate, that the exclusion of the plant would render the city completely incapable of funding services and improvements in the annexation area. Thus, the chancellor's denial of the reasonable portions of the annexation, ante, is not justified by the evidence.
This Court has the authority, in an appropriate case, to modify an annexation on appeal. Wise v. City of Biloxi, 361 So.2d 1372 (Miss. 1978). Therefore, the chancellor's denial of the annexation of *942 those areas found unreasonable[1] is affirmed; the chancellor's denial of the remainder of the proposed annexation as submitted by the City of Greenville is reversed, and this cause is remanded for the chancellor to draw the boundary of the area permitted to be annexed not inconsistent with this opinion. Those areas as to which we affirm the chancellor's denial of annexation are the following:
HAMMETT FARMLANDS
South 1/2 of Section 13, Township 18 North, Range 8 West, including Farmers, Inc.
HIGHLAND PLANTATION
COMET DELTA, INC.
MP & L STEAM GENERATING PLANT
The portion proposed to be annexed in Section 2, Township 18 North, Range 8 West.
Southeast 1/4, Section 33, Township 19 North, Range 8 West.
East 1/2, Section 9, Township 18 North, Range 8 West.
Section 12, Township 18 North, Range 8 West.
Section 16, Township 18 North, Range 8 West.
East 1/2 of Section 9, Township 17 North, Range 8 West, except for that part of Marco Place Subdivision which jots into the East 1/2.
The remainder of the proposed annexation is approved.
AFFIRMED IN PART; REVERSED IN PART, AND REMANDED.
ROY NOBLE LEE and HAWKINS, P.JJ., and PRATHER, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
DAN M. LEE, J., concurs in part and dissents in part with written opinion.
ROBERTSON, J., not participating.
DAN M. LEE, Justice, dissenting.
The learned chancellor did precisely what we indicated he should do in Western Line Consolidated v. City of Greenville, 465 So.2d 1057 (Miss. 1985); therefore, I would affirm his most detailed and scholarly opinion in toto.
Accordingly, I concur in that part of the majority which affirms the decision of the chancellor and dissent to that part of the opinion that reverses and renders.
NOTES
[*] (The City also has outstanding Revenue Bonds not counted here.)
[1] Although there is some overlap in this list, it includes all areas for which the chancellor found annexation unreasonable.