627 So.2d 292 (1993)
In the Matter of the ENLARGEMENT OF the CORPORATE LIMITS AND BOUNDARIES OF the CITY OF GULFPORT, Mississippi.
The COMMITTEE FOR the IMPROVEMENT OF ORANGE GROVE, INC.
v.
CITY OF GULFPORT, Mississippi.
No. 92-CA-0033.
Supreme Court of Mississippi.
September 9, 1993.
Rehearing Denied December 16, 1993.
Jess H. Dickinson, Dickinson & Associates, P.A., Harry R. Allen, Allen Cobb & Hood, Gulfport, for appellant.
Jerry L. Mills, Pyle Dreher Mills & Dye, Jackson, Hugh Dennis Keating, Dukes Dukes Keating & Faneca, Gulfport, for appellee.
EN BANC.
HAWKINS, Chief Justice, for the court:
This is an appeal by citizens of the Orange Grove community from a judgment enlarging the corporate limits of Gulfport. We find no error and affirm.

FACTS
Gulfport presently encompasses 29.37 square miles within its corporate boundary, and according to the 1990 census, had a population of 40,775.
By city ordinance number 1792 adopted by the city January 19, 1988, and petition filed February 1, 1988, in the Chancery Court of the First Judicial District of Harrison County, the city sought to add 53.65 square miles with 27,827 additional inhabitants to the city, making a proposed total population of 68,602.
Following a six-week hearing before a special chancellor, the court found the westernmost and northernmost part of the proposed area to be annexed unreasonable, but did find approximately 33 square miles with approximately 22,618 inhabitants a reasonable area to be annexed. This area, presently unincorporated, and the most highly-developed portion of which is known as the Orange Grove community, was found by the chancellor to be in the path of growth of the city. The area approved is adjacent to and north of the present corporate limits. Highway 49 runs north and south across the *293 westernmost part of the approved area, and Interstate 10 runs east and west across the southern part.
While there were numerous objectors to the petition to annex, only the Committee for the Improvement of Orange Grove, Inc., comprised of a number of inhabitants of the Orange Grove community, has appealed. The city did not cross-appeal.

LAW
Recently, in Matter of Enlargement of Corp. Limits of Hattiesburg, 588 So.2d 814, 818 (Miss. 1991), we noted:
This Court has set forth a list of factors or so called indicia of reasonableness to guide the chancellor in his determination of the reasonableness of a city's annexation request. The Court first enumerated these factors in Dodd v. City of Jackson, 238 Miss. 372, 396-97, 118 So.2d 319, 330 (1960), and in later decisions has expanded the list.
We then set forth a total of twelve factors which our decisions had held were appropriate considerations by the chancery court in determining whether or not the proposed area to be annexed within a municipality was reasonable or not. Matter of Enlargement of Corp. Limits of Hattiesburg, 588 So.2d at 818-19. We then held:
These factors, however, are only indicia of reasonableness, not separate and distinct tests in and of themselves. Bassett v. Town of Taylorsville, 542 So.2d 918, 921 (Miss. 1989). The chancellor must consider all of these factors and determine whether under the totality of the circumstances the annexation is reasonable. Id. at 921-22; In the Matter of the Extension of the Boundaries of the City of Vicksburg, 560 So.2d 713, 715 (Miss. 1990); In the Enlargement of the Corporate Boundaries of the City of Booneville v. City of Booneville, 551 So.2d 890, 892 (Miss. 1989); In the Matter of the Extension of the Boundaries of the City of Jackson, 551 So.2d 861, 864 (Miss. 1989). This Court's standard of review is very limited. The Court can only reverse the Chancery Court's findings as to the reasonableness of an annexation if the chancellor's decision is manifestly wrong and is not supported by substantial and credible evidence. As restated in Extension of the Boundaries of City of Vicksburg, 560 So.2d 713, 716 (Miss. 1990):
[I]f there is credible, albeit conflicting evidence, this Court will defer to the Chancery Court's findings. Bassett, 542 So.2d at 921, citing McElhaney, [v. City of Horn Lake], 501 So.2d [401] at 403 [Miss. 1987]; [Extension of Boundaries of] Moss Point [v. Sherman], 492 So.2d [289] at 290 [Miss. 1986]; Liddell v. Jones, 482 So.2d 1131 [Miss. 1986]; Hans v. Hans, 482 So.2d 1117 (Miss. 1986). In the context of conflicting credible evidence, this Court will not disturb a lower court ruling unless it can be said that from all the evidence such findings are manifestly wrong. Bassett, 542 So.2d at 921, citing McElhaney, 501 So.2d at 403; Extension of the Boundaries of City of Biloxi v. City of Biloxi, 361 So.2d 1372, 1376 (Miss. 1978); City of Picayune v. Quick, 238 Miss. 429, 117 So.2d 718 (1960).

See also In re Enlargement of the Boundaries of Yazoo City v. City of Yazoo City, 452 So.2d 837 (Miss. 1984); In the Matter of the Extension of the Boundaries of the City of Clinton, 450 So.2d 85 (Miss. 1984); Curet v. City of Long Beach, 399 So.2d 1351 (Miss. 1981).
Matter of Enlargement of Corp. Limits of Hattiesburg, 588 So.2d at 819 (brackets original).
As noted in Hattiesburg, once a chancellor has considered all these factors and made written findings thereon, our "standard of review is very limited."
In this case an able special chancellor, following an extended hearing with over 250 exhibits, some of which were quite detailed, did consider all the appropriate factors and made a cogitative and judicious finding on each of them. All his findings were clearly supported by substantial evidence, and clearly none was manifestly wrong. His findings were in accord with settled principles enunciated by this Court which need no repetition, and we resist the temptation to quote from his well-written, carefully-drafted opinion.
*294 Rarely is a hearing on extension of a municipality's corporate limits unattended by heated objections from citizens of the affected area. Because extension of the corporate limits of any municipality does seriously affect property owners in their daily lives, this Court in enunciating guiding principles has never taken these objections lightly. The learned special chancellor in this case also gave serious and thoughtful study to the respective positions of all parties, and nevertheless found that the area approved was clearly within the path of growth of Gulfport and was a reasonable area to be annexed within the city. We are not at liberty to disturb his findings or conclusion.
While not raised in the briefs on appeal, it was stated in oral argument that the city may have bargained with some of the industries or utilities to grant special tax advantages to remove their objection to the annexation. The city, of course, can only grant that which it has the legal authority to grant, but any questions there as to may be addressed in another forum, and form no part of our consideration on this appeal.
Finding no error, we affirm the judgment of the chancery court.
AFFIRMED.
PRATHER, P.J., BANKS, McRAE, AND JAMES L. ROBERTS, Jr., JJ., concur.
JAMES L. ROBERTS, Jr., J., specially concurs with separate written opinion joined by BANKS, J.
SMITH, J., dissents with separate written opinion joined by DAN M. LEE, P.J., and SULLIVAN, J.
PITTMAN, J., not participating.
JAMES L. ROBERTS, Jr., Justice, specially concurring:
I agree with the majority because the special chancellor carefully followed the law as established by this Court.
The dissent bears more than passing interest as to similar cases in the future.
I am concerned that the city granted special tax status to an extremely large utility and a large commercial entity in the proposed annexed territory, but that individual objectors do not rise to the same level of importance.
The Legislature may wish to address whether or not objectors residing in territory proposed to be annexed by a municipality have the right to exercise their wishes at the ballot box. Whether the results of such a procedure were mandatory or merely advisory, those individual objectors and all citizens would have a greater forum for the expression of their wishes.
BANKS, J., joins this opinion.
SMITH, Justice, dissenting.
Because of the patterns emerging in our annexation decisions, as to our attempts to balance equities between the cities and individual objectors as well as our standard of determination of what constitutes reasonableness, there is convincing evidence that the rules need changing to give a fairer balance to these equities, and establish more suitable criteria for determining reasonableness.
Annexation, like other matters concerning the creation, organization, and alteration of municipal entities is a mandated legislative function, authorized by Article 4, Section 88 of the Mississippi Constitution of 1890. In annexation matters, the judicial function of the Chancery Court and this Court on review is strictly limited to the question of reasonableness.
The historical changes since 1890 concerning annexation cases are primarily the results of politics, simply "passing the buck," or more probably, a "hot potato," bounced around from the legislature, to the Circuit Court, then to the Chancery Court. This process has resulted in the Court changing its rules from time to time to accommodate and keep up with the changes. It may be that we have arrived at a point where the legislature needs to take another look at this quagmire we have created, and possibly take back this "hot potato" unto themselves.
In attempting to deal with this situation, the Court set out "The Test" in Dodd v. City of Jackson, 238 Miss. 372, 118 So.2d 319 (1960). Numerous recent decisions convincingly *295 indicate that the test has been expanded so far that now it is absolutely meaningless. We say we must balance the equities of both the cities seeking to annex territory and the objectors, being pulled, kicking, screaming and protesting all the way, within newly proposed boundary lines, and forced to become residents of the city against their wills.
Objectors, to the last one, simply want to be left alone. I fear equity has not treated these citizen protestors fairly on most occasions, including the case at bar. What is meant by the formula we now use? Who knows? These days, we see annexation cases that, by appearances, are nothing short of "tax grabs" to support a stagnant municipality with little or no growth and, accordingly, no path of growth either. This opinion is designed to single out these apparent "tax grab" cases. Cities need and deserve the right to growth and expansion. Citizen objectors are entitled to balanced equity and review of their concerns also, in determining what is "reasonable" by our mandated judicial review. Cities should be compelled to ascertain these citizens' concerns prior to annexation attempts. This might be accomplished by several different means, the least of which could be by public hearings within the proposed annexed territory. A referendum in the proposed annexation area is also a possibility worthy of consideration. In the case at bar, the City of Gulfport did not help its image of "tax grabbing," at the expense of the average citizen objector, when the City admitted in oral argument to granting a special tax exemption to an extremely large utility and a very large commercial entity in the proposed annexed territory to settle these former objector's dispute and withdraw their objections to the annexation on appeal. Tax exemptions are disfavored generally, perhaps because they seem to conflict with principles of fairness; equality, and uniformity in bearing the burden of government.
The majority notes that Ordinance 1792 proposed to annex approximately fifty-three square miles of Harrison County, Mississippi, almost tripling the existing boundaries of the City. The City argues that the proposed enlargement was reasonable and would best serve the public interest, convenience and necessity.
Although many of the original objectors have withdrawn from the appeal to this Court, one large group of very vocal protestors persists. Orange Grove is a residential community subdivision located north of Gulfport, above I-10, which has appealed the Chancellor's decision, averring that the learned Chancellor was in error in his determination that the annexation on behalf of the City was reasonable. Other areas the chancellor allowed Gulfport to annex did not have any objectors.
The standard of review has evolved over time to keep pace with the legislative changes and this Court's own expansion of criteria in our attempt to more appropriately balance the equities and guidelines between the parties. For a complete history lesson on the numerous changes, one need only review the opinion of Justice Dan M. Lee, in Western Line Consol. v. City of Greenville, 465 So.2d 1057 (Miss. 1985). The criteria utilized by the court in determining what is reasonable was established in Dodd v. City of Jackson, 238 Miss. 372, 118 So.2d 319 (1960), and Extension of Boundaries of Horn Lake v. Renfro, 365 So.2d 623 (Miss. 1978). There have been numerous subsequent decisions since that recognizing this standard. This Court in Matter of the Boundaries of the City of Jackson v. City of Ridgeland, et al., 551 So.2d 861, 864 (Miss. 1989), again set forth the history of our case law concerning annexation matters. It is not necessary to restate this history entirely as this has been done so many times previously. Needless to say, the indicia of reasonableness have been expanded from time to time.
This Court in Bassett v. Town of Taylorsville, 542 So.2d 918 (Miss. 1989), emphasized that "these factors are indicia of reasonableness and not separate and distinct tests in and of themselves." In Bassett, it was also determined that a municipality's governing board must first find that the annexation is "required by the public convenience and necessity." Miss.Code.Ann. Sec. 21-3-33 (1972). The Chancery Court must ultimately determine whether the proposed annexation is reasonable. "The reasonableness standard, *296 of course, has in mind the interest both of the municipality seeking annexation and, as well, the owners of property and other inhabitants of the area sought to be annexed. (citation omitted) Reasonableness is a judicial question." Id. at 920-21.
It is also important to emphasize that "the common thread that must run through any reasonableness criteria is fairness." Western Line Consol. School Dist. v. City of Greenville, 465 So.2d 1057, 1059 (Miss. 1985). Finally, "[o]nly by reviewing the annexation from the perspective of both the city and the landowner can the chancellor adequately determine the issue of reasonableness... . An unreasonable annexation is an unfair one and, as fairness is the foundation of equity, an annexation cannot be both unreasonable and equitable." Id. at 1059.
The indicia of reasonableness have been expanded and have been unequivocally endorsed and utilized by this Court. Case law urges the court in determining the reasonableness of an annexation, to consider the matter from the perspective of the city and the landowners in the area to be annexed. The "economic and personal impact on these landowners is as important a concern as the city's need to grow." Id. at 1059.
These indicia of reasonableness, although not exclusive, seem to serve as a so called "report card" for the municipality and whether the city has reached a level whereby expansion is necessitated or required. Throughout the trial in the case sub judice, much of the testimony was delivered by experts, and generally was sharply conflicting. It could almost be characterized as presenting a question of which expert was doing the best guessing, and upon whom the chancellor would ultimately rely in making his decision. In addition to the many experts who testified in the court below, there were former city officials and others whose testimony also appears to be suspect as to the reasonableness of this annexation.
Former Mayor Leroy Urey testified that the annexation proposal was developed primarily to increase the City's tax base. Although he stated that the additional property was needed to meet the City's need for commercial growth, he was unable to cite one instance where a prospective business was unable to find suitable land for development within the current City boundaries. Moreover, he conceded that the City deliberately chose annexation as a means of increasing its tax base over other efforts to stimulate growth within the City, including tax incentives to prospective businesses locating in the downtown area. Yet, the City had no qualms about settling with the largest utility on the Gulf Coast and a large commercial entity, by giving them a tax exemption as a trade off for not appealing this case to this Court. Cities should be required to demonstrate other valid reasons for annexation other than mere tax base increases.
The City of Gulfport sought to establish the reasonableness of the proposed annexation by establishing a significant need for growth. Ron Jones, a city planner, testified expansion was necessary due to; (1) projected growth in population, and (2) the lack of sufficient land for development within the City to satisfy this projected growth. Jones cited the flood plain located within Gulfport as a likely constraint to development. However, Jones, as well as the City's other experts, Michael Bridge and Joseph Lusteck, conceded that flood plain property was suitable for development and the proof at trial clearly showed the development of a major commercial establishment just south of I-10 in the flood plain.
The proof at trial also revealed that the amount of vacant land within the City had actually increased from 1980 until 1987, with the total vacant property within the current city limits of Gulfport constituting 4.61 square miles of which 7.1 acres is situated downtown. Gulfport did not produce a single developer who could testify that he had to go outside the city limits to find available land for development. Indeed, two developers testified that they had never been required to seek land for development land outside of Gulfport's corporate limits. Testimony by developers indicated that the lack of development within Gulfport was not the result of lack of available property but rather could be attributed to a slow economy.
*297 Ron Jones conceded that the City's population was expected to increase by only 4,725 persons over the next 25 years. By comparison, the entire population of Long Beach (7,967 persons) was housed in a total area of 3.5 square miles.
Testimony presented at trial concerning the City's population and projected population as it related to its need for expansion is very revealing indeed. The 1990 United States Census cites Gulfport's population as 40,775, compared to 39,676 reported in 1980. Is the small increase attributable to growth? Absolutely not. Gulfport's only growth was the annexing of 1,199 persons in 1983. The City actually experienced a loss in population during this past decade.
The experts, Michael Bridge and Joseph Lusteck, testified that expansion was necessary to accommodate "projected future growth," even though no growth had actually occurred during the last ten years. These opinions were based on population projections by Mr. Lusteck. Mr. Lusteck's 1979 projections included a population of 47,900 for Gulfport by 1980, and 52,050 by 1990. The projections were considerably off the mark. Once again, the experts attempted to explain away these inaccurate projections by attributing them to a great outward migration and growth in the contiguous areas outside of the City. This expert's theory of so called "spillover growth" into the proposed area of annexation is not supported by actual proof in the record. There is evidence in the record that this spillover factor was due instead to the opening of Interstate 10 in 1970, residents' desires to build in an area less affected by potential hurricanes, and the desire of people to seek a different lifestyle. Former Mayor Urey also conceded that the initial growth in the proposed area of annexation was due to the opening of Interstate 10. Careful scrutiny of these expert projections reveals them for what they are  inordinately speculative and unreliable predictions.
Lewis Bisso, a city planner with over 55 years of experience, testified that the City was between 75% and 85% "built out," and that growth would continue at its current pace based upon current and past population figures. He further stated that, assuming the City's rate of growth increased, the need for expansion would be satisfied by annexing the available area south of I-10, including vacant property lying to the west of the current corporate limits.
However, the city had no growth during the last ten years. Such lack of growth diminishes the need for expansion. No growth equals no path of growth either. There is sufficient vacant land for development within existing city limits. Obviously the Orange Grove area is not necessary for Gulfport's expansion. Gulfport had no growth during the past decade. There exist substantial amounts of property area within the current city limits for expansion and growth. It is clear from the record that the growth in residential and commercial properties north of I-10, including Orange Grove occurred for the most part after Hurricane Camille in 1969, and the opening of I-10 in 1970. A common complaint alleged by cities is tax flight. Such is not the case here. The Orange Grove area developed primarily from both existing residents from various cities along the coast as well as newcomers to the area. All desired better protection from the threat of storms than the city provided and had other valid affirmative reasons for choosing this area to establish residences and businesses. The inescapable conclusion is that this annexation's primary function was to augment Gulfport's tax base at the expense of Orange Grove.
The City sought to show the proposed area of annexation needed improved municipal services. The record clearly showed that the law enforcement services of the Harrison County Sheriff's Department were more than adequate to the needs of Orange Grove. George Payne, Gulfport's Chief of Police, testified that the majority of the proposed area was considered "low crime" and not in much need of municipal police services. Sheriff Joe Price confirmed that the existing law enforcement service were adequate. Also, the public in the affected area was satisfied with its current law enforcement.
The chancellor's opinion failed to note that many of the sites which he regarded as potential health hazards, including all sites south of I-10, had been improved when the *298 two sewer systems merged after the creation of the Harrison County Waste Water Treatment District. The chancellor relied heavily on 101 instances of septic tanks in the Orange Grove area as health concerns. There were 10,000 persons in the Orange Grove area. The number utilizing septic tanks was 1%. The remaining 99% utilized the Harrison County Waste Water System.
The City attempted to show problems with the need for sanitation services in the proposed area. However, no proof was offered to show that the method of disposal utilized in the proposed area was either unsatisfactory to the residents or created a present or potential health hazard to either the residents in the affected area or the City of Gulfport. Other complaints dealing with water and sewer problems were met with counter proof indicating similar if not greater problems within Gulfport's current city limits. The perceived health hazard was corrected and failed to provide sufficient evidence to support the chancellor's findings.
The chancellor found the City would be better able to cope with street maintenance. There is no proof in the record that current county street maintenance was inadequate. The evidence failed to support the chancellor's finding. From testimony about street and road conditions within Gulfport and the proposed area, the two areas appeared to be about equal. Streets were generally good in both locations.
The City proposed to upgrade and improve the fire protection system in the proposed annexation area. Orange Grove had 10 fire stations. A five year plan to increase fire protection in the area had been implemented, and additional equipment, including eight new fire trucks were being purchased. Admittedly, the inclusion of the area within Gulfport's corporate limits would probably result in lower rates of insurance for homeowners and businesses alike.
The chancellor's opinion found zoning was needed in the proposed annexation area. This issue had been put to the voters by referendum and soundly rejected as not needed. The chancellor found that zoning was needed in the proposed area to protect the residents from future incompatible land uses. This finding flies squarely in the face of the record evidence which showed zoning in the area had been rejected by the voters, and was not needed. The area of annexation was clearly shown to be well defined with respect to commercial and residential area. Few isolated incidents of incompatible land uses were exhibited. Numerous incompatible land uses were demonstrated to exist within the boundary of the City of Gulfport, including the presence of night clubs in residential neighborhoods. The record evidence does not suggest the need for overall planning and zoning and this factor should not have been weighed in favor of the proposed annexation.
The chancellor found the proposed additional recreational service would improve the overall quality of life of the residents in the area. Again, no proof was submitted to establish a present need for any additional recreational facilities or that the existing facilities did not adequately service the needs of the residents of the area.
Testimony was presented regarding the economic impact to residents. Jim Wetzel, Harrison County Tax Assessor, testified that annexation would result in significant increases in property taxes. The cost of car tags would significantly increase also. The millage within the current city will triple from three to nine mills as a result of the annexation. Much of the financial ability which the city attributes to itself, in actuality, should be properly credited to the residents in the proposed annexation area. If this annexation stands, according to the financial data submitted by the city in Exhibit 188, page 480, Gulfport will be operating in the red in six years. I submit that this is a serious economic impact on the city residents.
Only a limited number of residents in the affected area were allowed by the Chancellor to testify. Each testified that the level of the municipal services currently being provided by the County was more than sufficient to provide adequate fire and police protection in the affected area. Each further testified that there was adequate road maintenance and sewage service provided to all residents. *299 Many residents objected to the proposed annexation because they chose to live outside the City and desired to maintain their quasi-rural community. Each stated that the proposed increase in municipal services would not provide any appreciable benefits when balanced against the significant tax increase which would result from annexation. The sentiment of the people in the proposed annexation area was well-established through the testimony of Roy Dedeaux and Mildred Taylor. Both had been a citizen of Harrison County for over 80 years and objected to the annexation. The sentiment and interests of the people in the proposed area of annexation are critical factors which must be considered and are critical in balancing the equities. See, Matter of Enlargement of Corp Limits, 588 So.2d 814, 826 (Miss. 1991). These people in Orange Grove and the surrounding affected area simply preferred semi-country life to city life and did not want to be annexed. Cities must face this reality. Some people do not like city life, period. As Justice Blass so ably asked in Matter of the Boundaries of City of Jackson, 551 So.2d 861, 869: "If city life is so advantageous and socially desirable as to be forced upon people by judicial decree, why is there so much litigation in opposition to city expansion. Why are the people not clamoring for these advantages?" Id.
Gulfport claims to have delivered on past commitments to residents annexed within the city. However, the record seems to dispute this argument. Hue Snowden, a former Harrison County Supervisor, testified that it took Gulfport 12 to 13 years to provide services in Hansboro, an area Gulfport previously annexed, and further, that there are still septic tanks in the City of Gulfport today. This particular issue has repeatedly surfaced in annexation cases. Predominately minority areas routinely complain of being the last to receive city services. If cities were required to prove compliance with delivery of services to an annexed area according to a pre-established court ordered timetable, this age old alleged discriminatory problem would practically be eliminated.
Although the City alleges that the people who reside in the affected areas are reaping the benefits of proximity to the City without paying their fair share of taxes, there is not one scintilla of evidence as to the number of persons in the proposed annexation area who work in Gulfport. There is no evidence to show that most of the persons in the area do not work all over the Gulf Coast, from Pascagoula to Bay St. Louis. Facilities and services in both the City and the proposed annexation area generally appear to be about equal, and the city's alleged proof that Orange Grove residents enjoy Gulfport services without paying for them is simply non-existent.
The cases involving annexations thus far decided by this Court have rarely disallowed expansion of a city's corporate limits. See, e.g. Matter of Enlargement of Corp. Limits, 588 So.2d 814 (Miss. 1991). Individual property owners opposing an annexation attempt thus encounter an extraordinarily difficult burden. They must convince this Court that the determination of the chancellor was so erroneous that the chancellor could not reasonably have reached this result based on the adduced evidence. "They would face an easier task by proving the chancellor drew the expanding boundary lines while wearing a blindfold." See Matter of the Boundaries of City of Vicksburg, 560 So.2d 713, 715 (Miss. 1990) (Sullivan, J., dissenting). They might just as well attempt to send a camel through the eye of a needle in my opinion.
Justice Blass, in a dissenting opinion concerning the reasonableness of an approved annexation, wrote: "Chancellors and this Court are deciding whether annexations are reasonable on the basis of personal judgments and not the law." In Re City of Booneville, Prentiss County, 551 So.2d 890, 896-97 (Miss. 1989). This Court later in Bassett formally listed and adopted the "indicia of reasonableness" standards. The question is: are these indicia capable of being viewed as concrete and clear legal standards? It is difficult to answer that question in the affirmative. The totality of the circumstances must be examined and there must be a determination that the expansion would bring about a fair result. There is insufficient evidence to balance the equities between the parties herein. The process is in need of strengthening. The law as it currently *300 stands makes it nearly impossible for individual citizens to succeed in opposing a proposed annexation. Dodd v. City of Jackson, 238 Miss. 372, 118 So.2d 319 (1960); Enlargement of Boundaries of Yazoo City v. Yazoo, 452 So.2d 837 (Miss. 1984); Western Line Consol. School Dist. v. City of Greenville, 465 So.2d 1057 (Miss. 1985); McElhaney v. City of Horn Lake, 501 So.2d 401 (Miss. 1987); City of Greenville v. Farmers, Inc., 513 So.2d 932 (Miss. 1987); Bassett v. Town of Taylorsville, 542 So.2d 918 (Miss. 1989); In Re City of Booneville, Prentiss County, 551 So.2d 890 (Miss. 1989); Matter of Boundaries of City of Jackson, 551 So.2d 861 (Miss. 1989); Matter of Boundaries of City of Vicksburg, 560 So.2d 713 (Miss. 1990). As a matter of fact, individual objectors have not been successful before this Court in annexation cases in modern times.
The record is overwhelmingly persuasive that the primary reason for this annexation is to augment the City of Gulfport's tax revenues by reaching out for vast amounts of new land area. Services and improvements are promised, but will clearly be paid for by those persons and businesses in the affected area. Yet, the governmental entity making the decision does not represent the people paying the taxes; shades of the Boston Tea Party. This very situation was confronted by Justice Blass, in his dissent in Matter of Boundaries of City of Jackson, 551 So.2d 861, 869 (Miss. 1989). Justice Blass, wrote:
The only reason we are reversing is that the Court has decided that the City of Jackson, and, perhaps, cities generally, should be allowed to augment their tax revenues by reaching out for new territories upon which to levy.
... .
There is much discussion about the path of the city's growth, but I have not seen a decision which adequately explains why cities have the right to grow by absorbing those who do not wish to be absorbed. These hapless souls are not consulted. They are merely selected to provide additional revenues to be expended by those who have been elected by others and for purposes which probably will benefit, primarily, those who took them in. When cities are concerned we abandon the hallowed concept of democracy that the just powers of the government are derived from the consent of the governed. Nations which extend their boundaries without the consent of the occupants of the new territory are condemned as aggressors. Cities are merely vibrant and growing, even if every citizen brought in is screaming in protest.
Id.
Some people apparently prefer a more simple lifestyle, a semi-country atmosphere as compared to the city. These individual taxpayers must receive the same fair equitable considerations as cities. They are long overdue this consideration. Where the city attempts to annex areas and there are no objections, or where individuals desire and solicit the city to annex them, the situation is entirely different than the case sub judice. Many of these good citizens have moved to get away from city life, and many have probably always lived outside of the city and have no desire to be annexed;
They are governed by a county government. They may be satisfied with it or, perhaps, feel that one local government is bad enough, without having to put up with two. Some are ordinary folk, living on fixed incomes, who are unable to pay the additional taxes. They are not selfish persons who have moved just far enough to escape taxes, while remaining close enough to enjoy the cultural benefits afforded by the city.
Id.
In the case at bar, when applying these comments one has to come to grips with this question. How much longer can Harrison County afford multiple governments? Soon, the entire county will be comprised of cities if this trend of unchecked, inequitable annexation continues. Double taxation is obviously wasteful. Duplication of services is worse for taxpayers. There is nothing new nowadays in combining county and city governments into metro governments which makes for more efficient government for fewer tax dollars appropriated. The elected officials of Harrison County and others similarly situated *301 must face up to this fact and put the people's interest and their hard-earned tax dollars as a first priority over self preservation of their antiquated systems of government. The "horns of the dilemma" are readily apparent when the question is posed to supervisors, mayors and aldermen; which of you are prepared to give up your position in the interest of saving tax dollars and duplicated services? Many may be called to answer this question, yet few, if any, will sacrifice self for the good of tax payers in forming a more efficient government requiring fewer tax dollars for the same services.
This annexation effort of Gulfport is one of the largest ever attempted in the history of the State. It comes on the heels of a prior annexation attempt by Gulfport only eight short years age, in which the Chancellor denied Gulfport virtually all of the requested area. Nothing has changed. Gulfport did not need the area then, and it does not need the area now.
The land area sought then was substantially less than the vast amount sought on this occasion. This annexation attempt is nothing short of a grab for taxes by a city government which has difficulty taking care of its own streets and other problems. Gulfport should be denied annexation, or at least denied annexation north of Interstate 10.
The time is ripe for change regarding procedures to insure fairness in this process of what constitutes reasonableness. This Court has traveled on a one way street far too long. This process was never intended to be anything but a two way street, open and accessible to both cities and individual objectors, each entitled to the same unbiased fairness supposedly afforded under the legislative process and judicial determination of reasonableness in annexation cases.
This annexation was not reasonable. The burden placed upon individual objectors in the proposed annexation area is too high a mountain to climb. Equity and fairness is lacking, hence unreasonableness is obvious. This is a one sided system. The deck has been stacked against citizen objectors. The Orange Grove area and the area north of I-10 should be given a new hearing based on new guidelines established by this opinion.
The better means of accomplishing the balancing of equity, fairness, and determination of what is reasonable in this annexation process would be accomplished by following the proposal of Justice Sullivan, dissenting in Matter of Boundaries of City of Vicksburg, 560 So.2d 713, 716-717 (Miss. 1990). Justice Sullivan wrote:
I propose that a municipality, in order to go forward with any annexation, must first show by a preponderance of evidence, that it now adequately provides all municipal services to all areas already within municipal limits. If, in a bifurcated trial, the municipality meets this requirement, the city may then proceed to show why annexation is necessary, and exactly what, when and how it will provide services to the area to be annexed.
If this is accomplished, annexation may be granted but the chancellor's judgment must set out a time table for the city to accomplish what it claims it can for the newly annexed area. If, at the end of the period set out in the judgment the protestors can show by a preponderance of the evidence that the city has not provided the promised services, then the chancellor must set the annexation aside. If they fail, the chancellor shall confirm the annexation.
The better procedure requires a bifurcated hearing before the chancellor. As proposed by Justice Sullivan in Vicksburg, the city must [1] "show by a preponderance of evidence that it now adequately provides all municipal services to all areas within municipal limits." Id. I would expand Justice Sullivan's proposal to include [2] valid reasons for annexation other than for a mere tax base increase and [3] that more than 50% of the persons residing in the proposed annexation area support the annexation attempt. If the city meets their requirements, the city may then proceed to show why annexation is necessary, and exactly what, when and how it will provide services to the area to be annexed. If this is accomplished, annexation may be granted but the chancellor's judgment must set out a timetable for the city to accomplish what it claims it can for the newly *302 annexed area. If, at the end of the period set out in the judgment the protestors can show by a preponderance of the evidence that the city has not provided the promised services, then the chancellor must set the annexation aside. If they fail, the chancellor shall confirm the annexation. Matter of Boundaries of City of Vicksburg, 560 So.2d at 717.
There probably is a better procedure for consideration of annexation cases that someone else might construct, but, in my humble opinion, it has yet to be invented. This proposal is most likely lacking in many aspects, but I anxiously welcome and await a better solution to this seemingly never ending problem.
We realize that the chancellor in this particular case was unaware of what we now propose. However, Justice Sullivan's Vicksburg dissent has been there for all who were interested to examine, and to certainly realize that at least one writing justice on this Court in 1990, joined by two others in dissent, felt this suggested procedure in Vicksburg, was more appropriate in annexation cases. It would be unfair to the litigants not to send this case back to apply this new procedure, which would come much closer to remedying inequities and assisting in the determination of what is "reasonableness" in annexation cases. All else failing, the remaining alternative is for the legislature to reconsider this problem, perhaps requiring public fora or referendums in the affected area to determine the wishes of the residents or to find more appropriate means of addressing annexation within the structure of our constitution.
I respectfully dissent to my distinguished colleagues' majority. I would reverse and remand this case for retrial under these suggested guidelines.
DAN M. LEE, P.J. and SULLIVAN, J., join this opinion.